UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
CASE No. 3:23-cv-539-BJD-PDB

SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

v.

CEDRIC DEWAYNE GRIFFIN,

     Defendant.

_____/

## PLAINTIFF'S MOTION FOR ENTRY OF DEFAULT JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT

### A. PRECISE STATEMENT OF THE RELIEF REQUESTED

Plaintiff Securities and Exchange Commission hereby respectfully seeks entry of a Final Default Judgment against Defendant Cedric DeWayne Griffin, imposing permanent injunctions, an officer and director bar, disgorgement of $1,945,024, with prejudgment interest of $420,927.78, and a civil penalty of $1,945,024.

### B. STATEMENT OF BASIS FOR REQUEST

Griffin failed to respond to the Complaint and a Clerk's Entry of Default was entered against him [ECF No. 22]. The Court granted the Commission until January 24, 2025 to apply for Default Final Judgment [ECF No. 26].

### C. PROCEDURAL HISTORY AND BACKGROUND

The Commission filed this case against Griffin on May 4, 2023, alleging violations of the anti-fraud provisions of the federal securities laws [ECF No. 1]. The Complaint alleges that from at least January 2020 through December 2021, Griffin,

through two private entities he controlled, raised more than $5.8 million from 103 investors through the sale of unregistered, short-term promissory notes in an offering fraud targeting the African-American community in Jacksonville, Florida. Griffin made material misrepresentations to investors, including that Griffin would use investor funds to purchase, rehabilitate, and resell real estate. Griffin did not purchase any real estate. Instead, he used investor funds for his personal expenses and to make Ponzi payments to repay principal and interest owed to earlier investors.

On the same day the Complaint was filed, Griffin was required to appear in Court in the felony criminal case against him in the Fourth Judicial Circuit in Duval County, Florida. Griffin failed to appear, the State Court issued a Failed to Appear Capias, and an e-warrant was issued. [ECF Nos. 5-1 & 5-2]. Griffin was ordered to appear before the Court on May 24, 2023 [ECF No. 5-1]. However, Griffin failed to appear, and the State Court issued Orders of Forfeiture [ECF No. 5-3]. Griffin has continued to hide from the criminal authorities and Commission [ECF No. 15]. Despite the outstanding warrant, Griffin has not surfaced publicly since May 2023. *Id.*

Against this backdrop, the Commission made diligent efforts to locate and serve Griffin through the Commission's process server and a private investigator to locate his hiding place. [ECF No. 15]. The Jacksonville Sheriff's Office issued bulletins about the Commission's case against Griffin asking the public to contact the Jacksonville Sherriff's Office with information [ECF No. 15]. The Defendant evaded law enforcement authorities and the Commission. [ECF Nos. 15-1 – 15-3]. On July 22, 2024, the Commission filed a Motion To Serve By Substituted Service [ECF

15].  On August 29, 2024, the Court granted the Commission's Motion for alternate service via the Florida Secretary of State [ECF No. 16] and on September 6, 2024, the Complaint and Summons were served on Griffin via the Florida Secretary of State [ECF No. 19].  Griffin failed to answer or submit a responsive pleading [ECF No. 20].  The Commission filed a Motion for Entry of Clerk's Default, which was granted, and a Clerk's Entry of Default was entered on October 8, 2024 [ECF Nos. 20- 22].

### D.  <u>MEMORANDUM OF LAW</u>

#### 1.  <u>Legal Standard</u>

The factual allegations of a complaint are deemed admitted by the entry of a default. *Buchanan v. Bowman*, 820 F.2d 359, 360 (11th Cir. 1987); *Nishimatsu Construction Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).  When a defendant fails to defend an action and a default has been entered, his liability for violations of the federal securities laws as alleged in the complaint, and the propriety of the relief sought, is deemed established. *Buchanan*, 820 F.2d at 360; *Miller v. Paradise of Port Richey, Inc.*, 75 F. Supp. 2d 1342, 1346 (M.D. Fla. 1999).  Here, the factual allegations of the Complaint [ECF No. 1] support entry of a Default Final Judgment as the allegations establish liability and the propriety of the relief sought.

#### 2.  <u>Violations of Securities Act Section 17(a) and Exchange Act Section 10(b)</u>

##### a.  **The Offerings are Securities**

From no later than January 2020 through approximately December 2021, Griffin offered and sold securities of G8 Equity and G8 RE in the form of short-term

promissory notes with a rollover option [ECF No. 1 at ¶ 12]. Congress defined "security" as "sufficiently broad to encompass virtually any instrument that might be sold as an investment." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990). Section 2(a)(1) of the Securities Act of 1933 ("Securities Act") and Section 3(a)(10) of the Securities Exchange Act of 1934 ("Exchange Act") define "security" to include "any note."

In *Reves*, the Supreme Court held that a "note" is presumed to be a security. 494 U.S. at 65. This presumption is rebuttable only if it is demonstrated either that the note is on a list of certain judicially excepted items (such as consumer financing notes, mortgage notes, and short-term commercial papers) or that the note bears a "strong resemblance" to an item on that list. *Id*. at 67. The promissory notes do not fall on the list of excepted items. Nor do they bear a strong resemblance to an item on that list.

Even if there is a resemblance to one of the enumerated categories that are identified as "not securities" (and here, there is not), courts continue the analysis and apply the *Reves* "family resemblance test" to determine if the note is a security. *SEC v. J.T. Wallenbrock*, 313 F.3d 532, 539 (9th Cir. 2002) ("The "judicially created categories" of exceptions to the general rule that notes are securities were purely hypothetical; the categories were not based on specific instruments to which later courts could draw sensible comparisons. Thus, further analysis is required to determine whether a given note is truly of the same type as one of the exceptions…."). Family resemblance depends on four factors: (1) the motivation for entering the transaction; (2) the plan of distribution; (3) the reasonable expectations of the investing public; and (4) whether there are any risk reducing factors that would make application

4

of the securities laws unnecessary. *Reves*, 494 U.S. at 66-68.  The more these factors suggest that the more a note is like a security, the more likely that it is a security.

All four factors support the Complaint's allegation that the notes are securities. As to the first factor, the Court examines the motivations that would prompt a reasonable buyer and seller to enter into the transaction. *Id*. at 66.  "If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'" *Id*.  In *Reves* this factor was satisfied because the issuer sold notes to raise capital for its business operations and purchasers bought them to earn "a profit in the form of interest." *Id*. at 68-69. Here, this factor similarly demonstrates the Notes are securities.  Griffin offered the Notes as investments that could generate investment returns and investors wanted an investment with investment returns [ECF No. 1 at ¶¶ 24, 26-28, 38-39, 54-55, 85-90].

The second factor requires that the court determine whether there was "common trading for speculation or investment" on the notes. *Reves*, 494 U.S. at 66. The offer and sale of the notes to a "broad segment of the public" is sufficient to establish this element. *Id.* at 68. *See, e.g., Wright v. Downs*, 972 F.2d 350, at *3 (6th Cir. July 17, 1992 (unpublished) (notes sold to 200 investors constituted broad segment). Here, this factor is met because the Notes were sold to at least 103 investors from at least 7 states who collectively invested at least $5,895,024 [ECF No. 1 at ¶¶ 19-22].

Under the third factor, courts examine "the reasonable expectations of the investing public," with the Court considering "instruments to be 'securities' on the

basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction." *Reves*, 494 U.S. at 66. Where the notes are characterized by the originator as "investments" and there are no "countervailing factors" that would lead a reasonable person to question this characterization, "it would be reasonable for a prospective purchaser to take the [originator] at its word." *Id.* at 69. *See also SEC v. J.T. Wallenbrock*, 313 F.3d 532, 539 (9th Cir. 2002) (third factor satisfied even though issuer did not describe the notes as an investment: "a reasonable investor sending funds to Wallenbrock for a guaranteed return of 20% and an automatic rollover every three months would expect that the funds were an investment, not a short-term loan"). Here, this factor is satisfied in favor of finding the G8 Notes as securities because the G8 Notes themselves are titled "Investment Note Payable Agreement" stating that they reflect an "investment," Griffin solicited investors by describing the investment as a passive, short-term investment, and investors were interested in an making an investment [ECF No. 1 at ¶¶ 15, 24, 26-27, 38-39, 54-55]. The fourth factor also weighs strongly in favor of finding the notes to be securities since there is no allegation in the Complaint of any risk-reducing factor, such as insurance [ECF No. 1]. Accordingly, the G8 Notes are securities.

Alternatively, the G8 Notes are securities in the form of "investment contracts." Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" broadly to include investment contracts. "Investment contract" is itself not defined in the statute. However, a scheme will be an investment contract when: (1)

investors make an investment of money, (2) in a common enterprise, (3) with an expectation of profits derived solely from the efforts of others. *SEC v. Edwards*, 540 U.S. 389, 393 (2004); *SEC v. W. J. Howey Co.*, 328 U.S. 293, 298-99 (1946).

The first factor is met because investors made an investment of money in the G8 Notes. [ECF No. 1 at ¶¶ 19, 29, 41, 43, 45, 47-50, 56, 64]. As to the second factor, the common enterprise element in the Eleventh Circuit may be satisfied by broad vertical commonality, requiring only a showing the investors are dependent for their returns on the expertise or efforts of the promoter. *See SEC v. ETS Payphone, Inc.*, 300 F.3d 1281, 1284 (11th Cir. 2004), *re-aff'd by SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 732 (11th Cir. 2005). The focus of the common enterprise requirement is on the nature of the investor's expectations with respect to the management of the investment. *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1200 (11th Cir. 1999). This factor is met because the investment was a passive investment in which investors relied on Griffin's expertise or efforts for their investment returns [ECF No. 1 at ¶¶ 24, 27, 39, 55, 93]. The third factor is similarly met because investors wanted a passive investment and Griffin told investors their returns would be generated solely from his efforts [ECF No. 1 at ¶¶ 24, 26-27, 38-39, 54-55]. Accordingly, the G8 Notes are securities.

**b. Section 17(a) of the Securities Act and Rule 10(b) of the Exchange Act**

The Commission alleges that Griffin violated Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act [ECF No. 1, Counts I-V1]. These statutes are very similar. The main difference is "that § 10(b) and Rule 10b-5 apply to acts committed in connection with a purchase or sale of securities while §

17(a) applies to acts committed in connection with an offer or sale of securities." *SEC v. Maio*, 51 F.3d 623, 631 (7th Cir. 1995) (emphasis in original); *see also SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 795 (11th Cir. 2015) ("Though Rule 10b-5 regulates a different activity, *i.e.*, the "purchase or sale" of securities rather than their "offer or sale," it borrows much, though not all, of its language from § 17(a).").

Rule 10b-5 and Section 17(a) both include three subsections. Rule 10b-5(a) makes it unlawful to "employ any device, scheme, or artifice to defraud"; subsection (b) makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading"; and subsection (c) makes it unlawful to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5(a)-(c).  Similarly, Section 17(a)(1) makes it unlawful "to employ any device, scheme, or artifice to defraud"; § 17(a)(2) makes it unlawful "to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made . . . not misleading"; and § 17(a)(3) makes it unlawful "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a).  In some cases, the Eleventh Circuit has indicated that violations of Section 10(b), Rule 10b-5, and Section 17(a) require a showing of "material misrepresentations or materially misleading omissions." *See SEC v. Merch. Cap., LLC*, 483 F.3d 747, 766 (11th Cir. 2007); *SEC v. Radius Cap. Corp.*, 653 F. App'x 744, 749 (11th Cir. 2016). However, the Eleventh Circuit has also clarified

that a defendant may be liable under both Section 17(a)(1) and (3) and Rule 10b-5(a) and (c) without making a material misrepresentation. *See Big Apple Consulting*, 783 F.3d at 796 (indicating that subsections (1) and (3) in § 17(a) and subsections (a) and (c) in Rule 10b–5 "prohibit schemes to defraud and fraudulent courses of business" and "do not use the word 'make' or even address misstatements"); *SEC v. Monterosso*, 756 F.3d 1326, 1334 (11th Cir. 2014) ("The operative language of section 17(a) does not require a defendant to "make" a statement in order to be liable . . . Likewise, subsections (a) and (c) of Rule 10b–5 'are not so restricted' as subsection (b), because they are not limited to 'the making of an untrue statement of a material fact.'"); *see also SEC v. Strebinger*, 114 F. Supp. 3d 1321, 1331 (N.D. Ga. 2015) ("[S]ubsection (a) and (c) of Rule 10b-5, unlike subsection (b), do not require an individual 'make' a false statement to establish liability."); *SEC v. Contrarian Press, LLC*, No. 16-06964, 2019 WL 1172268, at *4 (S.D.N.Y. Mar. 13, 2019) ("While Rule 10b-5(b) targets misleading disclosures, Rules 10b-5(a) and (c) target deceptive conduct.").

Accordingly, for claims under Section 17(a)(1)-(3), Section 10(b), and Rule 10b-5(a)-(c), the Commission must show: (1) a device, scheme, artifice to defraud; a material misrepresentation or omission; or an act, practice, or course of business which would operate as a fraud or deceit; (2) in the offer of or in connection with the purchase or sale of a security; and (3) in interstate commerce. *See SEC v. Quiros*, No. 16-21301, 2016 WL 11578637, at *12 (S.D. Fla. Nov. 21, 2016).  For claims under Section 17(a)(1) and Rule 10b-5, the Commission must also allege facts supporting scienter. *Merch. Cap.*, 483 F.3d at 766.  The Commission need only demonstrate negligence for

claims under Sections 17(a)(2) and (3). *Id.* There is "considerable overlap among the subsections of the Rule and related provisions of the securities laws"—*i.e.*, they prohibit some of the same conduct. *Lorenzo v. SEC*, 139 S. Ct. 1094, 1102 (2019). However, Rule 10b-5(b) and § 17 (a)(2) specifically require a misrepresentation. The Commission must demonstrate the use of interstate commerce, and the Complaint includes these allegations. [ECF No. 1 at ¶¶ 11, 98, 101, 104, 107, 110, 113].

c. **Section 17(a)(2) of the Securities Act and Rule 10b-5(b) of the Exchange Act**

As discussed above, to establish a violation of Rule 10b-5(b), the Commission must prove Griffin made a material misrepresentation or materially misleading omission in connection with the sale or purchase of securities with scienter. Section 17(a)(2) requires a showing of a material misrepresentation or materially misleading omission in connection with an offer or sale of securities made with negligence. The "in the offer or sale" provision of the Securities Act has been construed broadly. *United States v. Naftalin*, 441 U.S. 768, 772-73 (1979). The "in connection with" requirement of Section 10(b) also has been construed broadly and is satisfied if the fraud touches upon a securities transaction. *See SEC v. Zandford*, 535 U.S. 813, 822 (2002).

*(i) Griffin Made Material Misrepresentations and Omissions in Connection with the Offer or Sale of G8 Notes*

In the securities fraud context, the test for materiality is "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action." *Merch. Cap.*, 483 F.3d at 766 (quoting *SEC v. Carriba Air*, 681 F.2d 1318, 1323 (11th Cir. 1982)). A statement or omission is material where "there is a

substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable shareholder as having significantly altered the 'total mix of information available.'" *SEC v. Monterosso*, 768 F. Supp. 2d 1244, 1263 (S.D. Fla. 2011), aff'd, 756 F.3d 1326 (11th Cir. 2014) (quoting *SEC v. DCI Telecommunications, Inc.*, 122 F. Supp. 2d 495, 498 (S.D.N.Y. 2000)). Materiality is a mixed question of law and fact — and a complaint should not be dismissed on materiality grounds unless the alleged misstatements or omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

Here, from no later than January 2020 until at least December 2021, Griffin made oral and written material misrepresentations and omissions to investors in connection with the G8 Entities' securities offerings, concerning the use of investor funds and the source of investor returns [ECF No. 1 at ¶ 66]. Specifically, as to the use of investor funds, Griffin was the principal of the G8 Entities and the G8 Entities promissory notes stated that investor funds "will be used by G8 in regards to real estate investment deals" [*Id.* at ¶ 67]. The promissory notes stated no other use of investor funds [*Id.* at ¶ 68]. Griffin signed the G8 Notes as the "Manager" of G8 Equity or G8 RE [ECF No. 1 at ¶ 18] and provided investors with no other written information about the offering other than the promissory notes [ECF No. 1 at ¶ 24]. When meeting with potential investors at the G8 Entities' office, Griffin told investors he would use their funds to invest exclusively in real estate [*Id.* at ¶ 69]. For example, during the October 2021 meeting with investor V.B. in the G8 Entities' office in Jacksonville,

Florida, Griffin told V.B. that he would use her investment funds to purchase homes at wholesale prices and would sell the homes within 45 days for more than what he paid for them, thereby generating investment returns, and assured V.B. that Griffin would use V.B.'s funds exclusively to invest in real estate [*Id.* at ¶ 70]. At no time did Griffin tell V.B. that Griffin or the G8 Entities would use investor funds for any purpose other than investing in real estate [*Id.* at ¶ 71]. Griffin made these same representations to investor D.E. during the November 2020 meeting at the G8 Entities' office in Jacksonville, Florida [*Id.* at ¶ 72]. Specifically, during that meeting Griffin told D.E. that Griffin would use D.E.'s investor funds to purchase homes for cash and to sell them for more than what he paid for them a short time later [*Id.* at ¶ 73]. At no time did Griffin tell D.E. that Griffin or the G8 Entities would use investor funds for any purpose other than investing in real estate [*Id.* at ¶ 74].

Griffin's representations to investors about the use of investor funds were false [*Id.* at ¶ 75]. In truth, and contrary to his representations to investors, Griffin never used the investor funds raised in the G8 Entities' promissory note offerings to invest in real estate [*Id.* at ¶ 76]. Griffin was the sole signatory on the G8 Entities' bank accounts that received investor funds and he comingled investor money in those accounts as well as in bank accounts held in the names of other businesses Griffin owned and controlled [*Id.* at ¶ 77]. From no later than July 23, 2021 until at least December 17, 2021, Griffin used at least $3,950,000 of investor money to repay other investors their purported investment returns [*Id.* at ¶¶ 78-80].

Additionally, Griffin used investor funds for his personal use [*Id.* at ¶ 81]. From

March 2021 until December 2021, Griffin caused $141,699 in investor funds to be transferred into Griffin's personal bank accounts [*Id.* at ¶ 82]. From November 2020 until December 2021, Griffin made cash withdrawals from the G8 Entities' bank accounts totaling approximately $519,000 and from January 2020 until December 2021, Griffin spent at least $161,609 on personal expenditures from commingled funds that included investor money, including but not limited to payments to luxury retailers, jewelry stores, and church donations [*Id.* at ¶ 83].

As for misrepresentations and omissions about the source of investor returns, Griffin promised investors high monthly returns, both verbally during meetings and in the promissory notes [*Id.* at ¶ 85]. For example, many of the G8 Notes stated that the investor would receive at least a 10% return at the end of the one-month note period [*Id.* at ¶ 86]. On September 8, 2020, Griffin promised B.W. a 33% return in as little as 24 days [*Id.* at ¶ 87]. On September 26, 2020, Griffin promised T.W. a 33% return in as little as 24 days [*Id.* at ¶ 88]. On October 28, 2021, Griffin promised G.B. a 20% return in as little as 19 days [*Id.* at ¶ 89]. On November 15, 2021, Griffin promised M.C. a 15% return in as little as 4 days [*Id.* at ¶ 90]. On top of the high returns during the initial maturity period stated on the face of the promissory notes, the notes stated that the investments could be renewed with the investment principal and earned interest rolled over [*Id.* at ¶ 91]. As such, investors could purportedly earn more than 200% compounded returns in a year [*Id.* at ¶ 92].

During meetings with investors at the G8 Entities' office in Jacksonville, Florida from January 2020 until December 2021, Griffin told investors their returns would be

generated from his efforts in buying and flipping properties [*Id.* at ¶ 93]. However, during this same time period, Griffin was not using investor funds to purchase properties [*Id.* at ¶ 94]. Instead, from January 2020 until December 2021, Griffin was spending investor money on his living expenses and using investor funds to pay earlier investors their purported investment returns in Ponzi-like fashion [*Id.* at ¶ 95].

Griffin's misrepresentations and omissions about the use of investor funds and the source of investment returns were material. The general standard for assessing materiality, enunciated in *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976), has been applied by the Eleventh Circuit to require a finding that a reasonable person "would attach importance to the fact misrepresented or omitted in determining his course of action." *Carriba Air Inc.*, 681 F.2d at 1323. Any reasonable investor would certainly have wanted to know that Griffin's promises to use investor money to purchase real estate and make huge monthly profits were baseless and false, and that Griffin was misappropriating their investment contributions and stealing it for himself and to pay other investors their purported investment returns. Additionally, Griffin's misrepresentations and omissions were all made in connection with the offer or sale of the G8 Notes. [*Id.* at ¶¶ 66-95].

### (ii) Griffin Acted with Scienter

When Griffin made the representations to investors about the use of investor funds during the offering, Griffin knew or was reckless in not knowing that the representations were false because he had never used the G8 Entities' investor funds to invest in real estate and was instead using those funds for his personal use and to

pay prior investors their purported investment returns [*Id.* at ¶ 84]. From January 2020 until December 2021, Griffin was spending investor money on his living expenses and using investor funds to pay earlier investors their purported investment returns in Ponzi-like fashion [*Id.* at ¶ 95]. As a result, and because Griffin was not generating income from the purchase and sale of property, Griffin had no reasonable basis to believe he could pay investors the promised investment returns at the time Griffin represented these promised returns to investors [*Id.* at ¶ 96].

Thus, the Complaint allegations, deemed as true for purposes of this Motion, demonstrate Griffin's violations of Section 17(a)(2) and Rule 10b-5(b).

### d. Sections 17(a)(1) and (3) of the Securities Act and Rules 10b-5(a) and (c) of the Exchange Act

Under Rule 10b-5(a) and (c) and Section 17(a)(1), the Commission must show (1) the defendant committed a deceptive or manipulative act (2) in furtherance of the alleged scheme to defraud (3) with scienter. *SEC v. Glob. Dev. & Env't Res., Inc.*, No. 08-00993, 2008 WL 11338454, at *3 (M.D. Fla. Nov. 26, 2008); *Quiros*, 2016 WL 11578637, at *12. Section 17(a)(3) requires only a showing of negligence. *Id.*

Prior to the Supreme Court's holding in *Lorenzo*, many courts had adopted the position that Rule 10b-5(a) and (c) require deceptive acts distinct from the alleged misrepresentation forming the basis of a Rule 10b-5(b) claim, but courts have indicated that this position in no longer tenable in light of *Lorenzo*. *See SEC v. Winemaster*, No. 19-04843, 2021 WL 1172773, at *23 (N.D. Ill. Mar. 29, 2021); *see also In re Cognizant Tech. Sols. Corp. Sec. Litig.*, No. 16-06509, 2020 WL 3026564, at *17 (D.N.J. June 5,

2020) ("[U]nder *Lorenzo*, unlike prior precedent, a plaintiff need not necessarily allege deceptive conduct that extends beyond the alleged misstatement itself."). *See also SEC v. Complete Business Solutions Group, Inc.*, 538 F.Supp.3d 1309, (S.D. Fla., 2021) (applying this interpretation of *Lorenzo* to find allegations supporting 17(a)(2) and 10b-5(b) were sufficient to support claims under Sections 17(a)(1) and (3) and 10b5-(a),(c)).

In *Lorenzo*, the Supreme Court held that Rule 10b-5(a) and (c) "capture a wide range of conduct," including "the dissemination of false or misleading statements with intent to defraud . . . even if the disseminator did not 'make' the statements and consequently falls outside subsection (b) of the Rule." *Lorenzo*, 139 S. Ct. at 1100-01. The Supreme Court explained that there is "considerable overlap among the subsections" of Rule 10b-5 as "each succeeding prohibition was . . . meant to cover additional kinds of illegalities—not to narrow the reach of the prior sections." Id. at 1102. Thus, the Court emphasized that there is no basis to find that each subsection of Rule 10b-5 "should be read as governing different, mutually exclusive, spheres of conduct." *Id*. Regardless, the Complaint alleges conduct beyond misrepresentations and omissions. Specifically, the Complaint alleges Griffin misappropriated investor funds for his personal use and operated a Ponzi scheme. *Id.* at ¶¶ 77-83, 94-96.

As set forth above, only negligence is required under Sections 17(a)(2) and (3). Since the allegations support scienter, they support the lesser state of negligence.

### 3.  The Court Should Enter Permanent Injunctions Against Griffin

To obtain a permanent injunction against future violation of the securities laws,

the Commission must demonstrate that: (1) the Commission has actually succeeded on the merits, (2) irreparable harm will likely result in the absence of the injunction, (3) the balance of the equities tips in the Commission's favor, and (4) the injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008) (factors pertinent in assessing preliminary or permanent injunctive relief); *see also Starbucks v. McKinney*, 144 S. Ct. 1570, 1576 (2024) (noting that "[w]hen Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity," which, with regard to injunctive relief, includes using "the traditional four-part test" set forth in *Winter*).  In addition, "[e]very order granting an injunction . . . must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts sought to be restrained or required." Fed. R. Civ. P. 65(d). *See also SEC v. Goble*, 682 F.3d 934, 952 (11th Cir. 2012) ("[A] broad, but properly drafted injunction, which largely uses the statutory or regulatory language may satisfy the specificity requirement of Rule 65(d) so long as it clearly lets the defendant know what he is ordered to do or not do.").  The Commission meets all the prerequisites for permanent injunctive relief.

### a.  Success on the Merits

The Commission established above that Griffin violated the federal securities laws alleged in the Complaint and, thus, has succeeded on the merits of its claims.

### b. Likelihood of Irreparable Harm

Absent an injunction, there will likely be irreparable harm to investors given the

likelihood of Griffin's future violations of the federal securities laws. *See SEC v. Chappell*, 107 F.4th 114, 128- 29 (3d Cir. 2024) (recognizing that a "cognizable risk of future harm" satisfies the "irreparable harm requirement") (citing *SEC v. Gentile*, 939 F.3d 549, 555-58 (3d Cir. 2019). In determining whether a defendant is reasonably likely to continue to violate securities laws, courts consider: (1) the egregiousness of the defendant's actions; (2) the isolated or recurrent nature of the violations; (3) the degree of scienter; (4) the sincerity of the defendant's assurances against future violations; (5) the defendant's recognition of the wrongful nature of his conduct; and (6) the likelihood that the defendant's occupation will present opportunities for future violations. *Carriba Air*, 681 F.2d at 1322 (internal citation omitted). Not every factor must be present to warrant entry of an injunction. *See SEC v. Murphy*, 626 F.2d 633, 656 (9th Cir. 1980) ("[t]he factors are not individual prerequisites . . .").

As to the first and second factors, Griffin played a significant role in raising investor funds. He was the principal of the G8 Entities, executed the G8 notes, controlled the bank accounts through which he operated a Ponzi scheme and misappropriated investor funds, solicited investors and made material misrepresentations and omissions, raised more than $5.8 million from more than 100 investors, and engaged in the misconduct for two years [ECF No. 1 at ¶¶ 12-96]. As to the third factor, as set forth above, Griffin acted with a high degree of scienter. He solicited investors, promising to invest their money in real estate to generate investment returns while at the same time he was misappropriating investors' money for his personal use, failing to invest in any real estate, and using investor funds to pay

18

earlier investors their purported investment returns.

The fourth and fifth factors also favor injunctive relief. Griffin has not provided any assurance against future violations or acknowledged the wrongful nature of his conduct. Indeed, he has not responded to the allegations of the Complaint and has evaded service of process to avoid accountability. As to the sixth factor, there is likewise no comfort that Griffin's current occupation, which he has not disclosed because he has not appeared in this case, provides reduced risk of future violations.

### c. Balance of Equities

The balance of equities considers "the parties' relative harms," *i.e.*, the potential injury to the Commission without the injunction versus the potential injury to Griffin with it imposed. *SEC v. Chappell*, 107 F.4th at 138. Here, injunctive relief is necessary to protect investors from Griffin and to facilitate the Commission's enforcement of the federal securities laws. *See SEC v. Bonastia*, 614 F.2d 908, 912 (3d Cir. 1980) ("The purpose of injunctive relief is not to punish the violator, but to deter him from committing future infractions of the securities laws."). *SEC v. IMC Intern, Inc.*, 384 F.Supp. 889, 894 (N.D. Tex. 1974) ("When it is clearly shown that violations have occurred, the manifest difficulty of the Government's inspecting, investigating and litigating every complaint of a violation weighs heavily in favor of enforcement by injunction in this circuit, particularly since the statutory injunction is the basic tool provided the Commission for requiring compliance with the reporting provisions of the Exchange Act."). Furthermore, any potential injury that an injunction may impose upon Griffin is speculative. Griffin has not appeared in this action, much less

articulated any burden that may result from an injunction.

### d. Public Interest

"As a practical matter, if a plaintiff demonstrates both actual success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Chappell*, 107 F.4th at 139. The public interest in enforcing Congress' registration provisions favors enjoining Griffin. As set forth in the Complaint allegations, deemed true for purposes of this Motion, Griffin violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, which prohibit fraud in connection with the offer or sale of securities. There is a strong public interest in ensuring Griffin does not continue to defraud investors and in protecting investors from future harm.

### e. Specificity and Fair Notice

Rule 65(d) provides that "[e]very order granting an injunction . . . must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts sought to be restrained or required." *See* Fed. R. Civ. P. 65(d). The Eleventh Circuit likewise requires that judgments for injunctive relief describe in reasonable detail the acts or conduct sought to be restrained. *Goble*, 682 F.3d at 951-52. The *Goble* court, while questioning whether merely reciting the language of a statute in an injunction adequately informs a defendant of the prohibited conduct, also explained that "a broad, but properly drafted injunction, which largely uses the statutory or regulatory language may satisfy the specificity requirement of Rule 65(d) so long as it

clearly lets the defendant know what he is ordered to do or not do." *Id.* at 952.

Here, the proposed Final Judgment "largely uses" the language of the subject statutes, prohibits conduct directly tied to the Complaint allegations, and sufficiently notifies Griffin of the prohibited conduct by incorporating descriptive language:

> by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any person, or (ii) disseminating false or misleading documents, materials, or information or making, either orally or in writing, any false or misleading statement in any communication with any investor or prospective investor, about:
>
> (A) any investment strategy or investment in securities,
> (B) the prospects for success of any product or company,
> (C) the use of investor funds, or
> (D) the misappropriation of investor funds or investment proceeds.

### 4.  The Court Should Order Disgorgement with Prejudgment Interest, a Civil Penalty Against Griffin

#### a.  Disgorgement and Prejudgment Interest

Disgorgement is designed both to deprive a wrongdoer of their unjust enrichment and to deter others from violating the securities laws. *Blatt*, 583 F.2d at 1335; *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989); *SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1985); *SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987); *SEC v. Manor Nursing Centers*, 458 F.2d 1082, 1103-1104 (2d Cir. 1972) ("The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable").  Where, as here, the violation is "pervasive," the Court should order all profits stemming from the scheme to be disgorged. *CFTC v. British American Commodity Options Corp.*, 788 F.2d 92, 93- 94 (2d Cir. 1986), *cert. denied*, 479 U.S. 853 (1986).  Courts are empowered to order wrongdoers to disgorge the amount

of their profits from the wrongdoing. *ETS Payphones*, 408 F.3d at 735. "The District Court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997).

Griffin, through two private entities he controlled, raised more than $5.8 million from 103 investors through the sale of G8 promissory notes by making material misrepresentations to investors, including that he would use investor funds to purchase, rehabilitate, and quickly resell real estate when, in reality, Griffin did not purchase any real estate and instead used investor funds for his personal expenses and to make Ponzi-like payments to repay earlier investors [ECF No. 1 at ¶¶ 12-96]. Griffin used approximately $3,950,000 of investor money to repay other investors their purported investment returns, taking the balance for himself [*Id.* at ¶¶ 78-84]. Griffin failed to purchase any properties with investors' funds and instead used investor funds to pay investor returns and to line his own pockets. *Id.* As a result, Griffin's conduct resulted in significant investor losses of at least $1,945,024, representing the amount of unreturned principal ($5,895,024 raised from investors [*Id.* at ¶¶ 3, 19] minus $3,950,000 returned to investors) [*Id.* at ¶ 78].

Requiring Griffin to pay prejudgment interest is consistent with the equitable purpose of the disgorgement remedy. *Hughes Capital Corp.*, 917 F. Supp. at 1090. A defendant's wrongdoing justifies awards of prejudgment interest in accord with the doctrines of fundamental fairness. *Tome*, 638 F. Supp. at 639. The Court should order Griffin to pay prejudgment interest in the amount of $420,927.78, calculated as

commencing December 31, 2021, the date when the fraudulent conduct ended, through January 24, 2025 [Exhibit A, Prejudgment Interest Calculation].

### b. Civil Penalty

The Court should also impose a civil penalty against Griffin pursuant to Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act. The purposes of civil penalties are to punish the individual violator as well as deter future violations. *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 17 (D.D.C. 1998). As to the propriety of the proposed civil penalty amount, courts consider the following factors: (1) the egregiousness of the violations at issue; (2) the defendant's scienter; (3) the repeated nature of the violations; (4) the defendant's failure to admit to their wrongdoing; (5) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (6) the defendant's lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to the defendant's demonstrated current and future financial condition. *SEC v. Huff,* 758 F. Supp. 2d 1288, 1364 (S.D. Fla. 2010).

Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act authorize three tiers of civil penalties against violators. *SEC v. BIH Corp.*, No. 10-cv-577, 2014 WL 7057748 at *2 (M.D. Fla. Dec. 12, 2014); 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d). First-tier penalties apply to any violation of the Securities or Exchange Act. *Id*. Second-tier penalties apply to violations involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." *Id*. Third-tier penalties apply to any violation satisfying the second-tier criteria that "resulted in substantial

losses or created a significant risk of substantial losses to other persons." *Id.*

A third-tier civil penalty of $1,945,024, equal to the gross amount of Griffin's pecuniary gain, is appropriate because the violations involved fraud, deceit, manipulation, and deliberate disregard of regulatory requirements, and resulted in substantial losses to investors. As set forth above, Griffin's conduct was egregious. From at least January 2020 through December 2021, Griffin, through two private entities he controlled, raised at least $5.8 million from 103 investors through the sale of securities in the form of unregistered, short-term promissory notes in a fraudulent securities offering fraud targeting the African-American community in Jacksonville, Florida. Griffin made several material misrepresentations to investors, including that he would use investor funds to purchase, rehabilitate, and quickly resell real estate when, in truth, Griffin did not purchase any real estate and instead used investor funds for his personal expenses and to make Ponzi-like payments to repay earlier investors. As discussed above, Griffin acted with a high degree of scienter because at the same time he was promising investors to invest their funds in real estate for investment returns, Griffin was not spending any investor money to invest in real estate and was instead using investor funds to line his own pockets and operate a Ponzi scheme.

Griffin's conduct was repeated over the course of two years in connection with soliciting at least 103 investors across seven states. Not only has Griffin failed to take accountability for his misconduct, he evaded service of process in this case and is currently evading State law enforcement efforts in the criminal case against him [ECF No. 15]. Because Griffin has failed to appear in this case, there is no evidence of his

current financial status that could mitigate the amount of the civil penalty.

### 5. The Court Should Impose an Officer and Director Bar

Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act authorize a court to impose, an officer and director bar upon any person who has violated Section 17(a)(1) of the Securities Act or Section 10(b) of the Exchange Act, if the person's conduct demonstrates "unfitness to serve as an officer or director of a public company."   An officer and director bar against Griffin is appropriate given his roles as CEO of G8 Equity and President of G8 RE [ECF No. 1 at ¶ 7] even though he was not an officer of a public company because, as set forth above: (1) Griffin's actions were egregious; (2) he abused his respective positions; (3) his degree of scienter was high; (4) he had an economic stake and misappropriated investor funds; (5) he has not made assurances against future violations; and (6) he has not recognized the wrongful nature of his conduct. *See  SEC v. Patel*, 61 F.3d 137, 140-41 (2d Cir. 1995); *Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir. 1979); *SEC v. Bankosky*, 716 F.3d 45, 48-49 (2d Cir. 2013) (reading the *Steadman* factors as suggestive and non-exclusive indicators of unfitness to serve as a fiduciary).

### E. CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court grant the Commission's Motion for Entry of a Default Final Judgment against Griffin, permanently enjoining him from future violations of the federal securities laws, imposing an officer and director bar, and ordering disgorgement of $1,945,024, prejudgment interest of $420,927.78, and a civil penalty of $1,945,024.

January 24, 2025                          Respectfully submitted,

                              By:    s/ Amie Riggle Berlin
                                     Amie Riggle Berlin, Esq.
                                     Senior Trial Counsel
                                     Florida Bar No. 630020
                                     Direct Dial: (305) 982-6322
                                     Direct email: berlina@sec.gov

                                     Attorney for Plaintiff
                                     SECURITIES AND EXCHANGE COMMISSION
                                     801 Brickell Avenue, Suite 1950
                                     Miami, Florida  33131
                                     Telephone: (305) 982-6300
                                     Facsimile:   (305) 536-4154