United States District Court
Middle District of Florida
Jacksonville Division

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff,*

v.                                                            NO. 3:23-cv-539-BJD-PDB

CEDRIC DEWAYNE GRIFFIN,

*Defendant.*

---

## Report and Recommendation[1]

### I.   Overview

The Securities and Exchange Commission ("SEC") sues Cedric Dewayne Griffin, a former licensed real estate broker, for violations of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). D57. Elsewhere, he faces federal criminal fraud charges and state criminal fraud and theft charges.[2] After a period during which he could not be

---

[1]Citations to page numbers are to page numbers generated by CM/ECF.

[2]*See United States v. Griffin*, No. 3:26-cr-69-MMH-PDB (pending federal criminal case based on an indictment returned in April 2026 alleging misconduct relating to the Paycheck Protection Program and charging Griffin with three counts of wire fraud, in violation of 18 U.S.C. §§ 2 & 1343, and one count of making an illegal monetary transaction, in violation of 18 U.S.C. §§ 2 & 1957); *State of Florida v. Griffin*, No. 16-2024-CF-003129-AXX-MA (Fla. 4th Cir. Ct.) (pending state criminal case based on an information filed in March 2024 alleging a "systematic, on-going course of conduct with the intent to defraud[,]" in violation of Fla. Stat. § 817.034(4)(a)(1)); *State of Florida v. Griffin*, No. 16-2022-CF-002535-AXXX-MA (Fla. 4th Cir. Ct.) (pending state criminal case based on an amended information filed

found, *see* D13, he was taken into custody by state authorities, and a process server personally served him with process, D48. He failed to appear in this action, and the clerk entered default against him, D50. The SEC now applies for default judgment against him. D60.

## II.    Procedural History

In May 2023, the SEC filed the complaint. D1. The SEC moved for a 90-day extension to serve process, explaining that it had been unable to locate Griffin because he was evading service, including by failing to appear in state court to face the theft charges. D5 at 3–5. The court found good cause, granted the motion, and extended the deadline for serving process. D6.

The SEC moved for four additional extensions to serve process. D7, D9, D13, D15. Each time, the court found good cause, granted the motion, and extended the deadline. D8, D10, D14, D16. In the last motion, the SEC also moved for leave to serve Griffin with process through the Florida Secretary of State, D15, which the court granted, D16.

After serving process through the Secretary of State, D19, the SEC moved for default against Griffin, D20. The court granted the motion, D21, and, at the court's direction, the clerk entered default against him, D22. The court explained that any application for default judgment must include a memorandum of law explaining compliance with the Servicemembers Civil Relief Act, specifying the claims on which the SEC is requesting judgment and

---

in May 2022 alleging five counts of grand theft of property of Mallikarjuna Kamaveram, Tiffany Marie Tatham, Laura Delay Todd, Nywanna Collins, and April Carter, in violation of Fla. Stat. § 812.014(2)).

2

how the facts alleged in the pleading establish those claims, and stating whether the SEC maintains its jury demand. D21.

The SEC moved for an extension to file a motion for default judgment. D23. The court denied the motion for failure to comply with the Local Rules. D24. The SEC refiled the motion for an extension, explaining that it needed time to obtain authorization from the SEC Commissioners. D25. The court granted the motion and extended the deadline to file a motion for default judgment. D26.

The SEC moved for default judgment against Griffin. D29. The court denied the motion without prejudice to filing a motion that complied with the directives in the court's order granting the motion for default. D21.

The SEC again moved for default judgment. D31. The court ordered the SEC to supplement the motion by providing the affidavit required for service of process on the Florida Secretary of State (or explaining why one was unnecessary), explaining how the complaint's factual allegations establish an interstate commerce connection, and clarifying the amount requested for disgorgement. D37. Instead, the SEC filed an amended complaint, D38, and moved to re-serve Griffin through substituted service, D39.

By then, Griffin had been arrested and taken into state custody. *See Griffin*, No. 16-2024-CF-003129-AXX-MA (D7, D45); *Griffin*, No. 16-2022-CF-002535-AXXX-MA (D175, D206); n.2, *supra*. The court conducted a hearing to discuss the amended complaint and the effect of Griffin's custody on substitute service. D41, D42. At the hearing, the SEC orally moved for leave to amend the complaint, D43; to vacate the default, D44; and for an additional 60 to 90 days to serve Griffin with process, D44. The court granted the motions, D43, D44;

3

accepted the amended complaint, D38, as the operative pleading; extended the deadline to serve process by 60 days; and denied the motion for default judgment, D31, without prejudice. D45.

Once again, the SEC served process on Griffin, but this time did so personally at the Montgomery Correctional Center in Jacksonville, Florida. D48. After he failed to respond, the SEC again moved for default against him. D49. In September 2025, the clerk entered a second default against him. D50.

One month later, the SEC moved to stay the case due to the federal government shutdown. D51. The court granted the motion and stayed the case. D52. After the government reopened, the court lifted the stay and set a new deadline for the SEC to move for default judgment. D53. The SEC again moved for an extension of time to move for default judgment, again to obtain authorization from the SEC Commissioners. D54. The court granted the motion, extended the deadline, and gave the SEC an opportunity to file a second amended complaint to clarify or withdraw claims for relief, but not to add any new ones. D55.

The SEC filed a second amended complaint. D57. The SEC moved to exceed the page limits for its motion for default judgment, D58, which the court granted, D59. The current motion for default judgment followed, D60, along with a proposed judgment, D60-5, which the court permitted, D30 at 2.

In its papers, the SEC references only one of the pending state criminal cases against Griffin. *See, e.g.*, D5-1 (notice to bondsman for Griffin's failure to appear in *Griffin*, No. 16-2022-CF-002535-AXXX-MA); D60 at 2 (citing the same notice). In the other state criminal case, in November 2025, December 2025, and January 2026, Griffin's defense counsel notified the state court that

4

she "has reasons to believe, based on interactions with [Griffin], that he may not be oriented as to time and place and, as such, that he cannot aid in the preparation of his defense." *Griffin*, No. 16-2024-CF-003129-AXX-MA (D70, D76, D82). In January 2026, the state court appointed a psychologist to examine Griffin and stated that it would schedule a competency hearing upon the filing of a competency report. *Id.* (D83, D90). In February 2026, a psychologist conducted the examination. *Id.* (D117). No order on competency is entered on the docket. The next pretrial hearing is scheduled for October 12, 2026. *Id.* (D132).

## III.   Complaint

### A.   *Allegations*

The allegations are from the operative pleading, D57. For readability, quotation marks are not used for most verbatim allegations.

Before his incarceration, Griffin resided in Jacksonville, Florida. *Id.* ¶7. From October 2016 until September 2022, he was a real estate broker licensed in Florida. *Id.*

In 2016, Griffin formed G8 Equity LLC. *Id.* From at least 2020, he managed the company, and no later than April 2021 until at least February 2022, he served as its chief executive officer. *Id.* In April 2021, he formed G8 RE Capital LLC and served as its president until at least January 2022. *Id.* The companies, which purported to specialize in real estate investments, were Florida-based and had an office and principal place of business in Jacksonville. *Id.* ¶¶8–9, 23. Neither the companies nor their securities have ever been registered with the SEC. *Id.* ¶¶8–9.

5

Griffin lured people into investing in promissory notes issued by his companies. *Id.* ¶2. From January 2020 through at least December 2021, he raised at least $5,895,024 by selling notes to 103 investors. *Id.* ¶3. He told potential investors that he would use investor funds to buy, rehabilitate, and resell real estate, *id.* ¶4, but he did not use the funds for that purpose, *id.* ¶¶5, 79. He was the sole signatory on the companies' bank accounts that received investor funds, and he co-mingled investor funds in those accounts and in accounts held in the names of other businesses he owned and controlled. *Id.* ¶81.

Instead of using the investor funds to buy real estate, Griffin used them to pay purported investment returns to prior investors. *Id.* ¶¶6, 80. From no later than July 23, 2021, until at least December 17, 2021, he used at least $3,950,000 of investor funds to repay purported investment returns to other investors. *Id.* ¶82. For example, he used an investor's July 23, 2021, deposit of $135,000 to repay eleven others a total of $132,730 between July 27 and 30, 2021. *Id.* ¶83. As another example, he used an investor's November 23, 2021, deposit of $480,000 to repay 33 others a total of $335,569 on November 23, 24, 26, and 29, 2021. *Id.* ¶84.

Griffin also used investor funds for his own use. *Id.* ¶¶6, 85. He made cash withdrawals from the companies' bank accounts totaling approximately $548,000 and transferred approximately $30,000 to himself and his two sons, who were neither employed by, nor providing services to, the companies. *Id.* ¶86. During that same period, he also transferred at least $363,000 to his unrelated businesses and spent approximately $118,000 on personal expenditures, including goods from luxury retailers and jewelry stores, travel and automobile expenses, and church donations. *Id.* ¶87. When he represented

6

to investors how he would use investor funds during the offering, he knew or should have known that the representations were false because he had never used the companies' investor funds for real estate. *Id*. ¶88.

To find potential investors, Griffin relied on word-of-mouth within the Jacksonville community and at his church, C.R.P.A. *Id*. ¶21. He solicited prospective investors from at least seven states, including Georgia, South Carolina, North Carolina, Virginia, New Jersey, and New York, but most investors were African-Americans from Jacksonville. *Id*. ¶22. He routinely pitched the investment to investors in person at his companies' office. *Id*. ¶23. During the pitches, he provided no written information about the offering other than the note. *Id*. ¶24. He represented that he would use investors' money to buy real estate properties at wholesale prices and sell the properties quickly for a profit. *Id*. ¶¶24, 73. He touted his 20 years of experience as a licensed real estate broker in buying and selling real estate. *Id*. ¶24. He claimed that the experience enabled him to profitably resell real estate, thereby providing investors with high monthly returns. *Id*. He described the investment as a passive, short-term investment with investors' returns generated solely from his efforts. *Id*.

Griffin offered and sold at least 546 short-term promissory notes, with rollover options. *Id*. ¶¶12, 13. G8 Equity issued at least 156 notes, and G8 RE issued at least 390 notes. *Id*. ¶13. Except for the issuer name, the notes were substantially the same. *Id*. ¶14. The notes were titled "Investment Note Payable Agreement" and ranged in duration from 24 to 30 days. *Id*. ¶15. The notes provided interest rates of 10% to 33% per month, with the investors' principal returned at the end of the 24- to 30-day period. *Id*. ¶16. The notes stated that the issuer—G8 Equity or G8 RE—would use the investor proceeds

"in regards to real estate investment deals." *Id.* ¶¶17, 71–72. Griffin signed the notes as the "Manager" of G8 Equity or G8 RE. *Id.* ¶18.

Griffin promised investors high monthly returns, both verbally during meetings and in the promissory notes. *Id.* ¶89. On September 8, 2020, Griffin promised B.W. a 33% return in as little as 24 days. *Id.* ¶91. On September 26, 2020, he made the same promise to T.W. *Id.* ¶92. On October 28, 2021, he promised G.B. a 20% return in as little as 19 days. *Id.* ¶93. On November 15, 2021, he promised M.C. a 15% return in as little as 4 days. *Id.* ¶94.

Many of the notes stated that the investor would receive at least a 10% return at the end of the one-month note period. *Id.* ¶90. In addition, the notes stated that the investments could be renewed with the investment principal and earned interest rolled over. *Id.* ¶95. As such, investors could purportedly earn more than 200% compounded returns in a year. *Id.* ¶96.

After entering into the notes, investors made their investment payments by check or wire transfer to either G8 RE's or G8 Equity's bank account. *Id.* ¶25. If an investor chose not to roll over their investment for a new investment term, Griffin typically returned their principal or paid interest by check or wire transfer. *Id.* ¶26. He regularly communicated to investors about investment opportunities and the status of principal and interest payments by telephone, text messaging, and his "24ent" social media application. *Id.* ¶27.

Several people lost money, including "D.E." (a small-business owner, *id.* ¶39), "A.H." (another small-business owner, *id.* ¶55), "V.B." (a bank employee residing in Jacksonville, *id.* ¶28), and "J.S." (V.B.'s 18-year-old son, *id.* ¶32). *Id.* ¶¶28–69.

8

D.E., who lacked expertise in investing in private companies and flipping properties, and A.H., who lacked expertise in investing, were both interested in a passive investment that would generate investment returns. *Id.* ¶¶40, 57. V.B., who had no experience buying real estate and little experience in investing, wanted a safe and secure investment with no risk to her principal. *Id.* ¶29. D.E., A.H., and V.B. each met with Griffin at his companies' office. *Id.* ¶¶28, 39, 56. During the meetings, Griffin described the investment as passive and short-term and told them that, based on his experience buying and selling real estate, he could make a profit reselling homes quickly, and that was how he could pay investors high monthly returns. *Id.* ¶¶30, 41, 58.

During the meetings with D.E. and V.B., Griffin told them that he would use the investment funds to buy homes for cash at wholesale prices and generate investment returns by selling the homes within 45 days for more than he had paid. ¶¶74, 76–77. He assured V.B. that he would use her investment funds exclusively for real estate. *Id.* ¶74. He never told D.E. or V.B. that he or his companies would use investor funds for any other purpose. *Id.* ¶¶75, 78.

During D.E.'s November 2020 meeting, Griffin told D.E. that D.E. would receive approximately 25% interest in about 30 days, with the option to reinvest his principal and earned interest after the 30 days. *Id.* ¶41. On November 16, 2020, D.E. invested $20,000 for a G8 Equity note with a 32-day term, with $5,000 in interest to be paid before December 18, 2020. *Id.* ¶¶42–43. When the term ended, Griffin paid D.E. $5,000 in interest via check. *Id.* ¶44. In December 2020, D.E. renewed his investment in the note and invested $20,000 in a G8 Equity promissory note. *Id.* ¶45. He renewed the investment five more times, rolling it over into G8 Equity notes in January, March, and April 2021, and into G8 RE notes in May and October 2021. *Id.* ¶46.

9

On August 18, 2021, D.E. invested an additional $10,000 of principal in a second promissory note with G8 RE that provided $1,500 in interest to be paid by G8 RE to D.E. before September 23, 2021. *Id*. ¶47. D.E. renewed the investment two more times, rolling it over into G8 RE notes in September and November 2021. *Id*. ¶48.

On December 15, 2021, D.E. invested in two more G8 RE promissory notes for $30,417 and $15,208. *Id*. ¶¶49–50. The note in which D.E. invested $30,417 provided that G8 RE would pay him $4,562 in interest, plus principal, by January 11, 2022, and that the amounts could "be re-invested if opportunity presents itself." *Id*. ¶51. The note in which D.E. invested $15,208 provided that G8 RE would pay him $2,281 in interest, plus principal, by January 11, 2022, and that the amounts could "be re-invested if opportunity presents itself." *Id*. ¶52.

In December 2021, D.E. began hearing that Griffin and G8 Equity were not paying investors. *Id*. ¶53. D.E. texted Griffin about this, and Griffin responded, "[Y]ou'll be okay." *Id*. D.E. has not received the return of principal or any investment returns on the December 15, 2021, notes. *Id*. ¶54.

During A.H.'s August 2021 meeting, Griffin told her that she would receive approximately 10% interest in about 30 days, with the option to reinvest her principal and earn interest after the 30 days. *Id*. ¶58. On August 28, 2021, A.H., through her business, P.D.C., invested $100,000 in a G8 RE promissory note that provided for $10,000 in interest to be paid to A.H. in 40 days, together with the return of her principal investment, and with the option to renew the investment after the 40 days. *Id*. ¶¶59–60. On October 8, 2021, after the note matured, A.H. renewed the investment and rolled the principal investment and earned interest, totaling $110,000, into a renewal note for a

10

34-day term, with $11,000 in interest to be paid before November 11, 2021. *Id.* ¶¶61–62.

Also on October 8, 2021, A.H., through her business, P.D.C., invested $50,000 in a second G8 RE promissory note for a 34-day term, with $5,000 in interest payable before November 11, 2021. *Id.* ¶¶63–64. On November 1, 2021, Griffin paid A.H. $5,000 as interest on the second note. *Id.* ¶64. On November 12, 2021, A.H. renewed the principal investment and earned interest on the first note, totaling $121,000, in a G8 RE renewal note for a 33-day term, with $12,100 in interest payable by G8 RE to A.H. before December 15, 2021. *Id.* ¶65.

In November 2021, Griffin offered to pay A.H. a 20% return in less than 30 days if A.H. made an additional investment. *Id.* ¶66. On December 7, 2021, A.H., through her business, P.D.C., invested $75,000 in a third G8 RE promissory note for a 21-day term, with $15,000 in interest payable before December 28, 2021. *Id.* ¶67. On December 28, 2021, Griffin paid A.H. $15,000 by wire transfer as interest on the third note. *Id.* ¶67.

In December 2021, A.H. texted Griffin about the status of late payments. *Id.* ¶68. After responding to a few of her text messages, Griffin stopped responding. *Id.* He has not paid her the total of $225,000 in principal and approximately $33,100 in interest owed on the August 2021 G8 RE note and related renewal notes. *Id.* ¶69.

During V.B.'s October 2021 meeting, Griffing told her that she would receive approximately 10% interest in about 30 days and could reinvest her principal and earn additional interest after 30 days. *Id.* ¶31. On October 18, 2021, V.B. and J.S. jointly invested $13,000 in a G8 RE promissory note that

Griffin was selling. *Id.* ¶32. The note, executed by Griffin on behalf of G8 RE, was for a 28-day term, with $1,300 in interest payable by November 19, 2021, with the return of principal to V.B. and J.S. *Id.* ¶¶33–34. When the note matured, they renewed their principal investment and earned interest, totaling $14,300, to invest in a renewal note for a 31-day term, with $1,430 in interest to be paid to them by G8 RE by December 22, 2021. *Id.* ¶36. On December 28, 2021, they renewed their investment again, investing their principal investment and earned interest, totaling $15,730, in a renewal note for a 29-day term, with $1,573 in interest to be paid by January 25, 2022. *Id.* ¶37. After the second renewal, despite repeated text messages, neither V.B. nor J.S. heard from Griffin, and, to this day, they have not received their principal or any interest on their investment. *Id.* ¶37.

In January 2022, G8 RE was placed in Chapter 7 bankruptcy, and in February 2022, a trustee took control of the company and began administering its assets. *Id.* ¶8. In March 2022, the Jacksonville State Attorney's Office charged Griffin with grand theft in connection with his real estate business. *Id.* ¶7; *see* n.2, *supra*. In May 2022, the bankruptcy court consolidated the assets and liabilities of G8 Equity with G8 RE, to be administered by the trustee. *Id.* ¶9. In September 2022, the companies were administratively dissolved. *Id.* ¶¶8–9.

**B.    Claims**

The SEC brings six claims against Griffin: three claims of fraud in violation of § 10(b) of the Exchange Act, codified at 15 U.S.C. § 78j(b), and "SEC Rule 10b-5(a)–(c)," 17 C.F.R. § 240.10b-5(a)–(c) (counts I, II, and III); and three claims of fraud in violation of § 17(a)(1)–(3) of the Securities Act, codified at 15 U.S.C. § 77q(a)(1)–(3) (counts IV, V, and VI). D57 ¶¶101–18.

For the first claim, brought under § 10(b) and Rule 10b-5(a), the SEC alleges, "Griffin, beginning no later than January 2020 and ending no earlier than December 2021, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, **in connection with the purchase or sale of securities**, knowingly or recklessly, **employed devices, schemes or artifices to defraud**." D57 ¶102 (emphasis added).

For the second claim, brought under § 10(b) and Rule 10b-5(b), the SEC alleges, "Griffin, beginning no later than January 2020 and ending no earlier than December 2021, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, **in connection with the purchase or sale of securities**, knowingly or recklessly **made untrue statements of material facts or omitted to state material facts in order to make the statements made, in the light of the circumstances in which they were made, not misleading**." D57 ¶105 (emphasis added).

For the third claim, brought under § 10(b) and Rule 10b-5(c), the SEC alleges, "Griffin, beginning no later than January 2020 and ending no earlier than December 2021, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, **in connection with the purchase or sale of securities**, knowingly or recklessly **engaged in acts, practices, and courses of business which have operated, are now operating, and will operate as a fraud upon the purchasers of such securities**." D57 ¶108 (emphasis added).

For the fourth claim, brought under § 17(a)(1), the SEC alleges, "Griffin, beginning no later than January 2020 and ending no earlier than December 2021, by use of the means and instrumentalities of interstate commerce, or of the mails, **in connection with the offer or sale of securities**, knowingly or

13

recklessly **employed devices, schemes or artifices to defraud**." D57 ¶111 (emphasis added).

For the fifth claim, brought under § 17(a)(2), the SEC alleges, "Griffin, beginning no later than January 2020 and ending no earlier than December 2021, directly or indirectly, **in the offer or sale of securities**, by the use of means or instruments of transportation or communication in interstate commerce or of the mails, **negligently obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading**." D57 ¶114 (emphasis added).

For the sixth and final claim, brought under § 17(a)(3), the SEC alleges, "Griffin, beginning no later than January 2020 and ending no earlier than December 2021, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, **in connection with the offer or sale of securities**, **negligently engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers of such securities**." D57 ¶117 (emphasis added).

## C.   *Demand*

The SEC demands this relief:

1. a permanent injunction "restraining and enjoining Griffin, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with him, from violating [§] 10(b) of the Exchange Act and Rule 10b-5 thereunder, and [§] 17(a) of the Securities Act";

14

2. an order "directing Griffin to disgorge all ill-gotten gains received within the applicable statute of limitations, including prejudgment interest, resulting from the acts or courses of conduct alleged in [the] Second Amended Complaint[, D57]";

3. an order "directing Griffin to pay civil money penalties pursuant to [§] 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and [§] 21(d) of the Exchange Act, 15 U.S.C. § 78u(d)";

4. an order "pursuant to [§] 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and [§] 21(d) of the Exchange Act, 15 U.S.C. [§ 78u(d)], permanently prohibiting Griffin from serving as an officer or director of any issuer that has a class of securities registered pursuant to [§] 12 of the Exchange Act, [15 U.S.C. § 78l,] or that is required to file reports with the [SEC] pursuant to [§] 15(d) of the Exchange Act, [15 U.S.C. § 78o(d)]";

5. retention of jurisdiction over the action "to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the SEC for additional relief within the jurisdiction of this Court"; and

6. "such other and further relief as may be necessary and appropriate."

D57 at 23–24. The SEC also demands a jury trial. D57 at 24.

## IV.    Motion for Default Judgment

The SEC moves for default judgment against Griffin on all six claims. D60. The SEC asks for disgorgement in the amount of $694,529, prejudgment interest in the amount of $150,304.86, a civil penalty in the amount of $694,529, a permanent injunction, and an officer-and-director bar. D60 at 39.

The SEC includes five items with its motion for default judgment: (1) an affidavit of SEC paralegal Magaly Ordaz stating that Griffin is not on active duty with any branch of the United States Military, D60-1; (2) an affidavit of Ordaz stating that Griffin is neither an infant nor a minor and that no court

15

has ruled him incompetent, D60-2;[3] (3) a declaration of Monica Caswell, a forensic accountant who performed a financial analysis of the companies, D60-3 at 2–6, including her resume and experience, D60-3 at 7–12; a summary of the accounts analyzed, D60-3 at 13–18; a table showing the funds that Griffin received from investors, D60-3 at 19–24; a table showing the funds that Griffin returned to investors, D60-3 at 25–36; and a table showing Griffin's personal expenses that were comingled with investor funds, D60-3 at 37–56; (4) a prejudgment interest calculation, D60-4; and (5) a proposed judgment, D60-5.

## V.   Law and Analysis

### A.   *Default*

Under Rule 4, Federal Rules of Civil Procedure, "Unless federal law provides otherwise, an individual—other than a minor, an incompetent person, or a person whose waiver has been filed—may be served in a judicial district of the United States by … following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made[.]" Fed. R. Civ. P. 4(e)(1). Under Florida law, "Process against a state prisoner shall be served on the prisoner." Fla. Stat. § 48.051.

"A defendant must serve an answer … within 21 days after being served with the summons and complaint[.]" Fed. R. Civ. P. 12(a)(1)(A)(i). "When a party against whom a judgment for affirmative relief is sought has failed to

---

[3]In her affidavit, dated May 11, 2026, Ordaz states that she "reviewed a recent background report on Griffin using Thomas Reuters' Consolidated Lead Evaluation and Reporting … database" and "searched for his name in the Public Access to Court Electronic Records" and found no "evidence that he has ever been ruled incompetent." *Id*. D60-2 ¶3.

16

plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a).

Under Rule 5, Federal Rules of Civil Procedure, "a pleading filed after the original complaint" generally "must be served on every party[.]" Fed. R. Civ. P. 5(a)(1)(B). "No service is required on a party who is in default for failing to appear." Fed. R. Civ. P. 5(a)(2). "But a pleading that asserts a new claim for relief against such a party must be served on that party under Rule 4." *Id*.; *accord Campbell v. Bennett*, 47 F.4th 1362, 1365–67 (11th Cir. 2022) (reversing because the amended complaint, which had not been served on a defaulted defendant, contained a new claim for relief).

Here, under the penalty of perjury, a process server declares that he personally served Griffin with a summons and the first amended complaint, D38, on July 21, 2025, at Montgomery Correctional Center. D48. Griffin has never appeared to plead or otherwise defend himself. The clerk, therefore, properly entered default against him. D50.

After the process server served Griffin with process, D48, and after the clerk entered the second default against him, D50, the SEC amended its complaint for the second time, D57. The SEC neither asserts new claims nor demands new damages or other forms of relief. *Compare* D38, *with* D57. Accordingly, neither service under Rule 4 nor service under Rule 5 is required for the court to rely on the latest pleading, D57.

## B.    *Liability*

### 1.    *Default Judgment Standard*

"If the plaintiff's claim is for a sum certain or a sum that can be made certain by computation, the clerk—on the plaintiff's request, with an affidavit showing the amount due—must enter judgment for that amount and costs against a defendant who has been defaulted for not appearing and who is neither a minor nor an incompetent person." Fed. R. Civ. P. 55(b)(1). "In all other cases, the party must apply to the court for a default judgment." Fed. R. Civ. P. 55(b)(2).

"[A] defendant's default does not in itself warrant the court in entering a default judgment." *Nishimatsu Constr. Co., Ltd. v. Hou. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975). By defaulting, the defendant admits only the plaintiff's well-pleaded factual allegations, and those allegations must provide a "sufficient basis" for the judgment. *Id.* "In alleging fraud …, a party must state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.*

Because the default against Griffin was warranted, *see* § V.A, *supra*, default judgment against him is warranted if the SEC's well-pleaded factual allegations provide a sufficient basis for liability.

### 2.    *Securities*

Section 10(b) of the Exchange Act, codified at 15 U.S.C. § 78j(b); "SEC Rule 10b-5," 17 C.F.R. § 240.10b-5; and § 17(a) of the Securities Act, codified at 15 U.S.C. § 77q(a); each prohibit certain acts relating to a security.

"Security" means, among other things, "any note." 15 U.S.C. §§ 77b(a)(1), 78c(a)(10). The Supreme Court interpreted the term in *Reves v. Ernst & Young*, 494 U.S. 56 (1990). The Court began with the observation that the "fundamental purpose" of the Securities Acts is "to eliminate serious abuses in a largely unregulated securities market." *Reves*, 494 U.S. at 60 (quoted authority omitted). The Court explained that, "[i]n defining the scope of the market that it wished to regulate, Congress painted with a broad brush" and "recognized the virtually limitless scope of human ingenuity, especially in the creation of countless and variable schemes devised by those who seek the use of the money of others on the promise of profits[.]" *Id.* at 60–61 (internal quotation marks and quoted authority omitted). "Congress," the Court continued, "therefore did not attempt precisely to cabin the scope of the Securities Acts" and instead "enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." *Id.* at 61. But, the Court cautioned that Congress did not "intend to provide a broad federal remedy for all fraud." *Id.* (quoted authority omitted). The Court explained that, in determining whether something is a "security," a court is "not bound by legal formalisms," and "instead take[s] account of the economics of the transaction under investigation." *Id.*

To determine whether a note is a "security," the Court adopted a version of the "family resemblance" test. *Id.* at 67. The test begins with the presumption that every note is a security. *Id.* But the test "permits an issuer to rebut the presumption that a note is a security if [the issuer] can show that the note in question bears a strong family resemblance to an item on the judicially crafted list of exceptions, or convinces the court to add a new instrument to the list[.]" *Id.* at 64 (internal quotation marks, quoted authority, internal citations, and alteration omitted). The list of exceptions enumerates

categories of instruments commonly denominated "notes" falling outside of the "security" category. *Id.* at 65. The exceptions include "the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, … [the] note which simply formalizes an open-account debt incurred in the ordinary course of business[,] … [and] notes evidencing loans by commercial banks for current operations[.]" *Id.* (quoted authority omitted). To determine whether a note resembles an item on the list or whether an item should be added to the list, a court examines four factors.[4] *Id.* at 66–67.

---

[4]For the first factor, the court examines the motivations that "would prompt a reasonable seller and buyer to enter into [the note]." *Reves*, 494 U.S. at 66. "If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'" *Id.* "If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a 'security.'" *Id.*

For the second factor, the court examines "the plan of distribution of the instrument to determine whether it is an instrument in which there is common trading for speculation or investment[.]" *Id.* (internal quotation marks, quoted authority, and internal citation omitted). The offer and sale of notes to a "broad segment of the public" suffices. *Id.* at 68; *see, e.g.*, *Kirschner v. JP Morgan Chase Bank, N.A.,* 79 F.4th 290, 306 (2d Cir. 2023) (concluding that notes sold only to "sophisticated institutional entities" that submitted legally binding offers in response to a confidential information memorandum did not constitute a "broad-based, unrestricted sale to the general investing public" (internal quotation marks, quoted authority, and alterations omitted)); *McNabb v. SEC*, 298 F.3d 1126, 1132 (9th Cir. 2002) (concluding that six customers was not a broad segment of the public but that "this fact alone is not dispositive" and "must be weighed against the purchasing individual's need for the protection of the securities laws"); *SEC v. R.G. Reynolds*

Here, the court presumes the promissory notes are securities. Griffin has failed to appear to rebut that presumption.[5]

### 3.    *Securities Fraud*

Section 10(b) of the Exchange Act makes the following acts in connection with the **purchase or sale of securities** unlawful:

---

*Enters., Inc.*, 952 F.2d 1125, 1128, 1131 (9th Cir. 1991) (concluding that promissory notes issued to 148 investors in several states were offered and sold to a broad segment of the public).

For the third factor, the court examines "the reasonable expectations of the investing public." *Reves*, 494 U.S. at 66. "The [c]ourt will consider instruments to be 'securities' on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction." *Id.*

For the fourth factor, the court examines "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *Id.* at 67; *see id.* at 69 (observing that notes were uncollateralized and uninsured and "would escape federal regulation entirely if the Acts were held not to apply").

[5]In any event, accepting the allegations as true, the promissory notes neither resemble any of the instruments specified on the list of exceptions nor warrant placement thereon. The notes were titled, "Investment Note Payable Agreement." D57 ¶15. Griffin's stated purpose in issuing the notes was to raise money for his purported business of purchasing, rehabilitating, and reselling homes, *id.* ¶4, and the investors purchased the notes primarily to seek a passive investment opportunity that would provide returns, *id.* ¶¶24, 29, 40, 57. He sold at least 546 promissory notes to 103 people over almost two years and solicited investors in seven states. *Id.* ¶¶3, 12–13, 22. He held out the notes as passive, short-term investments, *id.* ¶¶24, 30, 41, 58, and the investors expected to earn returns by investing in them, *id.* ¶¶29, 40, 57. And no risk-reducing factors, like collateral, insurance, or other regulations, suggest that the notes are not securities.

In its motion for default judgment, the SEC also analyzes whether the promissory notes are securities under the test in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), for determining if an instrument is an investment contract. *See* D60 at 18–19. Because the notes are securities under *Reves*, the court need not consider whether the notes are securities under *W.J. Howey*.

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> …
>
> > (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement[,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (footnote omitted).

"The SEC promulgated Rule 10b[-]5 pursuant to authority granted under § 10(b)[.]" *Janus Cap. Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 141 (2011); *see also SEC v. Monterosso*, 756 F.3d 1326, 1333 (11th Cir. 2014) (explaining that Rule 10b-5 implements § 10(b)). Under Rule 10b-5,

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> > (a) To employ any device, scheme, or artifice to defraud,
> >
> > (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> >
> > (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. The scope of liability under § 10(b) and Rule 10b-5 is the same. *SEC v. Spartan Sec. Grp., Ltd.*, 164 F.4th 1231, 1252 (11th Cir. 2026).

22

Likewise, the same law that applies to Rule 10b-5(b) applies to Rule 10b-5(a) and (c). *See Monterosso*, 756 F.3d at 1333–34.

For a violation under § 10(b) or Rule 10b-5, the SEC must prove "(1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) made with scienter."[6] *Spartan*, 164 F.4th at 1252–53. The SEC also must prove that the defendant used "any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange[.]" 15 U.S.C. § 78j(b); *see also* 17 C.F.R. § 240.10b-5.

Section 17(a) of the Securities Act makes certain acts in connection with the **offer or sale of securities** unlawful:

> (a) Use of interstate commerce for purpose of fraud or deceit
>
> It shall be unlawful for any person in the offer or sale of any securities … by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—
>
>> (1) to employ any device, scheme, or artifice to defraud, or
>>
>> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>>
>> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

---

[6]Under § 10(b) and Rule 10b-5, "justifiable reliance" is an element of a private enforcement action but not an element of an SEC enforcement action. *SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1244 (11th Cir. 2012).

15 U.S.C. § 77q(a). "Though Rule 10b[-]5 regulates a different activity, i.e., the 'purchase or sale' of securities rather than their 'offer or sale,' it borrows much, though not all, of its language from § 17(a)." *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 795 (11th Cir. 2015).

Section 17(a) requires "substantially similar proof" as § 10(b) and Rule 10b-5. *Monterosso*, 756 F.3d at 1334. "[T]o show a violation of [§] 17(a)(1), the SEC must prove (1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with scienter." *Id.* (quoted authority omitted). "To show a violation of [§] 17(a)(2) or [§] 17(a)(3), the SEC need only demonstrate (1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with negligence." *Id.* The SEC must also establish that a defendant used "any means or instruments of transportation or communication in interstate commerce" or used any mails in connection with the violation. 15 U.S.C. § 77q(a).

Because of the substantial overlap in the elements that the SEC must prove to obtain relief on its six claims against Griffin, the undersigned analyzes and applies the requirements to Griffin's allegations together, rather than, as the SEC does, *see* D60 at 21–29, analyzing each claim separately.

(a)     <u>Interstate Commerce</u>

Under the Exchange Act, "[t]he term 'interstate commerce' means trade, commerce, transportation, or communication among the several States, or between any foreign country and any State, or between any State and any place or ship outside thereof." 15 U.S.C. § 78c(a)(17). "The term also includes intrastate use of (A) any facility of a national securities exchange or of a telephone or other interstate means of communication, or (B) any other

interstate instrumentality." *Id.*; *see Dupuy v. Dupuy*, 511 F.2d 641, 643–44 (5th Cir. 1975) (holding that under § 10(b) and Rule 10b-5, intrastate telephone use may constitute an instrumentality of interstate commerce). Similarly, under the Securities Act, "[t]he term 'interstate commerce' means trade or commerce in securities or any transportation or communication relating thereto among the several States or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia." 15 U.S.C. § 77b(a)(7).

By its nature, the internet is a facility in interstate commerce. *Cf. United States v. Forehand*, 577 F. App'x 942, 947 (11th Cir. 2014) (holding that the defendant committed securities fraud "by using facilities in interstate commerce: the mail, telephones, and the internet"); *United States v. Tinghui Xie*, 942 F.3d 228, 240 (5th Cir. 2019) ("To be convicted of insider trading, Liu had to have used some instrumentality of interstate commerce. The instrumentality could be a telephone, the internet, mail, or the facilities of a national securities exchange."); *United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004) (holding, in the context of the crime of using the internet to knowingly attempt to persuade, induce, entice, or coerce a minor to engage in unlawful sexual activity, that "[t]he internet is an instrumentality of interstate commerce").

Here, accepting the allegations as true, Griffin solicited prospective investors from at least seven states. D57 ¶22. Investors paid for their notes by check or wire transfer to the companies' bank accounts, and when he returned the investors' principal or interest, he did so by the same means. *Id.* ¶¶25–26, 44, 67. He communicated with the investors about their notes by telephone,

text messaging, or a social media application. *Id.* ¶¶27, 68. Through these allegations, the SEC satisfies the interstate commerce requirement.

(b)      Misrepresentations or Omissions

Under Rule 10b-5(b), the SEC must show that the person or entity alleged to have violated the rule "made" the material misrepresentations or omissions at issue. *Janus,* 564 U.S. at 141. "For purposes of Rule 10b[-]5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 142. "Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right." *Id.* Thus, "[o]ne who prepares or publishes a statement on behalf of another is not its maker." *Id.* "And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Id.* at 142–43. Unlike liability under Rule 10b-5(b), a defendant need not "make" a material misrepresentation or omission for liability under § 17(a) or Rule 10b-5(a) and (c). *Big Apple Consulting*, 783 F.3d at 796–97; *Monterosso*, 756 F.3d at 1334.

A misrepresentation or omission is material if "a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action." *SEC v. Merch. Cap., LLC*, 483 F.3d 747, 766 (11th Cir. 2007) (quoted authority omitted); *accord Spartan*, 164 F.4th at 1255. "Course of action means an investment decision." *Spartan*, 164 F.4th at 1255 (internal quotation marks and quoted authority omitted). In weighing materiality, courts consider "the total mix of information available to a hypothetical reasonable investor determining his course of action, not just the information

26

available to the public at large." *Id.* at 1256 (internal quotation marks and quoted authority omitted).

Here, accepting the allegations as true, Griffin, during meetings at the companies' offices, falsely told investors that he would use their investment funds to buy real estate and then sell it for a profit. D57 ¶¶4–5, 24, 30, 41, 58, 73, 79, 88. He falsely told them they would receive high monthly returns on their investments, generated by his efforts to buy and flip real estate. *Id.* ¶¶24, 31, 41, 58, 89–96. The notes, signed by him as the manager of the companies, *id.* ¶18, falsely stated that investor funds would be used for "real estate investment deals[,]" *id.* ¶¶17, 71–72. He omitted the actual use of investor funds—paying other investors and using the funds for personal use. *Id.* ¶¶6, 72, 80, 82–87. As the person who formed and led the companies, *id.* ¶7, he had ultimate authority over the statements and omissions. Through these allegations, the SEC satisfies the misrepresentation-or-omission requirement.

(c)     "In Connection with" or "In the Offer or Sale of"

The "in connection with" requirement under §10(b) and Rule 10b-5 and the "in the offer or sale of" requirement under § 17(a) are interpreted broadly, *SEC v. Zandford*, 535 U.S. 813, 819 (2002); *United States v. Naftalin*, 441 U.S. 768, 773 (1979), and interchangeably, *see Naftalin*, 441 U.S. at 773 n.4 (discussing the range of activities covered by the "in connection with" and "in the offer or sale of" requirements). "The Supreme Court has made clear that a direct or close relation between the fraud and the securities transaction is not required." *Spartan*, 164 F.4th at 1257 (quoted authority and alterations omitted). "Instead, it is enough that the fraud touch the sale in some manner, or coincide with it[.]" *Id.* at 1257–58 (internal quotation marks, quoted authority, and internal citations omitted). "[T]he requirement can be satisfied

27

even if the misrepresentations existed before any actual purchase or sale." *Id.* at 1258.

Here, accepting the allegations as true, Griffin made the misrepresentations and omissions when he pitched the promissory notes to investors, including in his companies' office. D57 ¶¶23–24, 73. Through that allegation, the SEC satisfies the "in connection with" requirement under § 10(b) and Rule 10b-5 and the "in the offer or sale of" requirement under § 17(a).

(d)     Scienter or Negligence

"Scienter may be established by a showing of knowing misconduct or severe recklessness[,]" *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982), and "can be established through circumstantial or direct evidence[,]" *Monterosso*, 756 F.3d at 1335. "Proof of recklessness would require a showing that the defendant's conduct was an extreme departure of the standards of ordinary care, ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Carriba Air*, 681 F.2d at 1324 (quoted authority omitted).

Here, accepting the allegations as true, Griffin acted with scienter because he knew the material misrepresentations and misleading omissions made to investors regarding the use of investor funds and the source of investor returns were false. He formed the companies and served as CEO of G8 Equity and president of G8 RE. D57 ¶7. He told investors that the invested funds would be used for real estate, but he did not use the investor funds for real estate. *Id.* ¶¶4–5, 24, 73, 79. He controlled the G8 bank accounts that received investor funds, comingled investor funds with his other businesses' accounts,

28

and caused investor funds to be transferred to his personal bank account. *Id.* ¶¶81, 85–87. He knew the misrepresentations were false. *Id.* ¶88. Through these allegations, the SEC satisfies the scienter requirement under § 10(b), Rule 10b-5, and § 17(a)(1), and the negligence requirement under § 17(a)(2) and (3).

(e)     Conclusion

The SEC's well-pleaded factual allegations establish each requirement of § 10(b), Rule 10b-5, and § 17(a). The SEC has alleged with sufficient particularity the circumstances that constitute the securities fraud. *See* Fed. R. Civ. P. 9(b). Accepting the allegations as true, the SEC provides a "sufficient basis" for relief, and default judgment is warranted against Griffin on all claims. *See Nishimatsu*, 515 F.2d at 1206 (quoted).

## C.     *Damages*

Once liability is established through default, the court must ensure "there is a legitimate basis for any damage award it enters[.]" *Anheuser Busch, Inc. v. Philpot*, 317 F.3d 1264, 1266 (11th Cir. 2003). "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c).

"The court may conduct hearings or make referrals—preserving any federal statutory right to a jury trial—when, to enter or effectuate [default] judgment, it needs to … determine the amount of damages[.]" Fed. R. Civ. P. 55(b)(2)(B). "It is a familiar practice and an exercise of judicial power for a court upon default, by taking evidence when necessary or by computation from facts of record, to fix the amount which the plaintiff is lawfully entitled to recover

29

and to give judgment accordingly." *Pope v. United States*, 323 U.S. 1, 12 (1944). "An evidentiary hearing is not a *per se* requirement; indeed, Rule 55(b)(2) speaks of evidentiary hearings in a permissive tone." *SEC v. Smyth*, 420 F.3d 1225, 1232 n.13 (11th Cir. 2005). "[N]o [evidentiary] hearing is required where all essential evidence is already of record." *Id.*

The SEC's evidence is sufficient to support damages, making an evidentiary hearing unnecessary.

### 1. *Disgorgement*

The SEC requests disgorgement in the amount of $694,529, "representing the amount of unreturned principal which Griffin retained for himself as ill-gotten gains." *See* D60 at 36 (quoted).

"In any action or proceeding brought by the [SEC] under any provision of the securities laws, the [SEC] may seek, and any Federal court may order, disgorgement." 15 U.S.C. § 78u(d)(7). "Disgorgement is a form of restitution measured by the defendant's wrongful gains." *Spartan*, 164 F.4th at 1265 (internal quotation marks, quoted authority, and alteration omitted). The SEC need not show that an investor suffered a pecuniary loss before securing a disgorgement remedy. *Sripetch v. SEC*, 146 S. Ct. 1403, 1410 (2026).

"The SEC is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004). "[E]xactitude is not a requirement." *Monterosso*, 756 F.3d at 1337 (quoted authority omitted). "Once the SEC has produced a reasonable approximation of the defendant's unlawfully acquired assets, the

burden shifts to the defendant to demonstrate the SEC's estimate is not reasonable." *Id.*

Here, Caswell conducted a financial analysis of the bank accounts and records related to the companies and makes the following declarations based on her findings. *See* D60-3. "Between January 2020 and December 2021, 103 investors who received a [p]romissory [n]ote … invested approximately $5,895,024 in the form of checks, bank-to-bank transfers, wire transfers, and cash." D60-3 ¶9. Griffin was "the sole signatory on the accounts that received investor funds." *Id.* ¶9. "Between January 2020 and early January 2022, [investors] received $5,200,495 in the form of checks signed by Griffin, outgoing wire transfers, bank-to-bank transfers, transfers via Zelle and Cash App, and cash." D60-3 ¶10. "Demonstrating the Ponzi-like nature of the scheme, the $5,200,495 that Griffin returned to investors was comprised of approximately $3,950,000 that can be traced to G8 [i]nvestor funds and $1,250,495 from other sources commingled with investor funds." D60-3 ¶11. "Based on the $5,895,024 raised by Griffin, less the $5,200,495 Griffin returned to investors as purported returns, Griffin retained approximately $694,529 of investor funds for himself." D60-3 ¶12.

Caswell's analysis produces "a reasonable approximation of [Griffin]'s ill-gotten gains." *See Calvo*, 378 F.3d at 1217 (quoted). He has not appeared to demonstrate the estimate is unreasonable. Disgorgement in the requested amount is appropriate.

2.     *Prejudgment Interest*

The SEC requests prejudgment interest based on the disgorgement award in the amount of $150,304.86, "calculated as commencing December 31,

31

2021, the date when the fraudulent conduct ended, through January 24, 2025[,]" the date the SEC first applied for default judgment. *See* D60 at 36–37 (quoted); D29. Using the IRS's quarterly interest rates for underpayments, the SEC provides a prejudgment interest calculation based on the principal amount of $694,529. *See* D60-4; United States Internal Revenue Service, Quarterly Interest Rates, www.irs.gov/payments/quarterly-interest-rates (last visited Aug. 6, 2026).

The decision to award prejudgment interest and the rate at which interest is awarded are within the district court's discretion. *SEC v. Carillo*, 325 F.3d 1268, 1269 (11th Cir. 2003). In awarding prejudgment interest, the court must establish the judgment amount, the prejudgment interest rate, and the date from which prejudgment interest accrues. *Id.* at 1272. The time frame for the imposition of prejudgment interest may begin with the date of the unlawful gain and end at the entry of judgment. *SEC v. First Jersey Sec.*, 101 F.3d 1450, 1476–77 (2d Cir. 1996).

Because an award of prejudgment interest is "compensatory rather than punitive, the award must be tempered by an assessment of the equities." *Osterneck v. E.T. Barwick Indus., Inc.*, 825 F.2d 1521, 1536 (11th Cir. 1987) (internal quotation marks and quoted authority omitted). To "balance the equities" is to "explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (quoted authority omitted).

The United States Supreme Court has provided examples of factors that district courts typically consider in deciding if and how much prejudgment interest should be awarded in a federal securities action, including "whether prejudgment interest is necessary to compensate the plaintiff fully for his

injuries, the degree of personal wrongdoing on the part of the defendant, the availability of alternative investment opportunities to the plaintiff, whether the plaintiff delayed in bringing or prosecuting the action, and other fundamental considerations of fairness." *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 176 (1989); *see also Blau v. Lehman*, 368 U.S. 403, 414 (1962) (explaining that "interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness" and is "denied when its exaction would be inequitable" (quoted authority omitted)); *SEC v. Merch. Cap., LLC*, 486 F. App'x 93, 97 (11th Cir. 2012) (finding no abuse of discretion in awarding prejudgment interest on the disgorgement amount and explaining that "[w]ithout prejudgment interest, the appellants would have benefitted from what in effect amounted to interest-free loans of the ill-gotten funds").

Courts have used the IRS underpayment rate when calculating prejudgment interest in SEC enforcement actions. *See, e.g.*, *SEC v. Lauer*, 478 F. App'x 550, 558 & n.3 (11th Cir. 2012) (concluding that "the district court did not abuse its discretion by applying the commonly-used IRS underpayment rate" and explaining that "[o]ther circuits have observed with approval the use of this rate"); *SEC v. MCC Int'l Corp.*, No. 22-cv-14129-Moore/McCabe, 2025 WL 1295061, at *7–8 (S.D. Fla. Feb. 25, 2025) (awarding prejudgment interest calculated using the IRS underpayment rate); *SEC v. Martin*, No. 6:17-cv-1385-Orl-37GJK, 2019 WL 1649948, at *3–4 (M.D. Fla. Apr. 1, 2019) (same). The IRS underpayment rate is defined as the federal short-term interest rate plus three percentage points. 26 U.S.C. § 6621(a)(2). The rate "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud." *First Jersey Sec.*, 101 F.3d at 1476.

Here, by using the IRS underpayment rate, the SEC's calculation essentially renders the award equal to the cost of borrowing the money from the government and therefore is not punitive. The SEC ends its calculation on the day it first applied for default judgment (January 24, 2025, *see* D29), thereby omitting interest that would have accrued due to litigation delays attributable to the SEC. *See* § II, *supra.* No inequitable result is apparent. Awarding prejudgment interest on the disgorgement award in the amount of $150,304.86 is fair and warranted.[7]

### 3.   *Civil Penalties*

The SEC requests a civil penalty in the amount of $694,529, "equal to the gross amount of Griffin's pecuniary gain." *See* D60 at 38 (quoted).

Section 21(d)(3) of the Exchange Act and § 20(d)(1) of the Securities Act allow the SEC to obtain civil penalties imposed by a court. Under § 21(d)(3) of the Exchange Act,

> Whenever it shall appear to the [SEC] that any person has violated any provision of this chapter, [or] the rules or regulations thereunder, … the [SEC] may bring an action in a United States district court to seek, and the court shall have jurisdiction to … impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation[.]

---

[7]The SEC's interest calculation may contain mathematical errors resulting in a requested amount that is less than what the SEC could have requested. *See* D60-4. The court need not, and should not, order interest in an amount greater than the SEC requests.

15 U.S.C. § 78u(d)(3)(A)(i). Section 20(d)(1) of the Securities Act has similar language:

> Whenever it shall appear to the [SEC] that any person has violated any provision of this subchapter, [or] the rules or regulations thereunder, … the [SEC] may bring an action in a United States district court to seek, and the court shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation.

*Id.* § 77t(d)(1).

"The amount of a civil penalty imposed … shall be determined by the court in light of the facts and circumstances." *Id.* § 78u(d)(3)(B)(i); *see also id.* § 77t(d)(2)(A) (similar). "Civil penalties are intended to punish the individual wrongdoer and to deter him and others from future securities violations." *Monterosso*, 756 F.3d at 1338. The SEC "need only make a proper showing that a violation has occurred and a penalty is warranted." *SEC v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008) (internal quotation marks and quoted authority omitted). The ability to pay is, at most, "one factor to be considered in imposing a penalty." *Id.*

Sections 21(d)(3) and 20(d)(1) provide three tiers of the maximum penalty allowed based on the nature of the violation.[8] Under the first tier, the amount of a civil penalty imposed for each violation "shall not exceed the greater of … $[11,823] for a natural person or … the gross amount of pecuniary

---

[8]The SEC adjusts the civil penalty amounts for inflation. *See* 17 C.F.R. § 201.1001 ("Adjustment of civil monetary penalties."); "United States Securities and Exchange Commission, Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission" (as of January 15, 2025), www.sec.gov/files/civil-penalties-inflation-adjustments-011525.pdf (last visited Aug. 6, 2026).

gain to such defendant as a result of the violation." 15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i). Under the second tier, the amount imposed for each violation "shall not exceed the greater of … $[118,225] for a natural person or … the gross amount of pecuniary gain to such defendant as a result of the violation, if the violation … involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." *Id*. §§ 77t(d)(2)(B), 78u(d)(3)(B)(ii). Under the third tier, the amount imposed for each violation "shall not exceed the greater of … $[236,451] for a natural person or … the gross amount of pecuniary gain to such defendant as a result of the violation, if … the violation … involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id*. §§ 77t(d)(2)(C)(I)–(II), 78u(d)(3)(B)(iii)(aa)–(bb).

Here, the SEC contends that a $694,529 penalty is appropriate for these reasons. Griffin's conduct was "egregious" because he "raised $5,895,024 from 103 investors through the sale of securities in the form of unregistered, short-term promissory notes in a fraudulent securities offering … targeting the African-American community in Jacksonville, Florida." *See* D60 at 38 (quoted); D57 ¶¶3, 12, 22. "Griffin made several material misrepresentations to investors, including that he would use investor funds to purchase, rehabilitate, and quickly resell real estate when, in truth, Griffin did not purchase any real estate and instead used investor funds for his personal expenses and to make Ponzi-like payments to repay earlier investors." *See* D60 at 38 (quoted); D57 ¶¶4–6, 24, 73, 79–88. "Griffin acted with a high degree of scienter because at the same time he was promising investors that he would invest their funds in real estate and generate investment returns, Griffin was not spending any investor money to invest in real estate and was instead using investor funds to

line his own pockets and to operate a Ponzi scheme." *See* D60 at 38 (quoted); D57 ¶¶6, 80–88. "Griffin's conduct was repeated over the course of two years in connection with soliciting at least 103 investors across seven states." *See* D60 at 38 (quoted); D57 ¶¶3, 12–13, 22. "Not only has Griffin failed to take accountability for his misconduct, he evaded service of process in this case." *See* D60 at 38 (quoted); D5, D7, D9, D13, D15. "Because Griffin has failed to appear in this case, there is no evidence of his current financial status that could mitigate the amount of the civil penalty." *See* D60 at 38 (quoted).

A violation has occurred, *see* § V.B.3, *supra*, and a penalty is warranted for the reasons provided by the SEC. Under any tier, a penalty of $694,529 is warranted because that is the amount of Griffin's pecuniary gain, *see* § V.C.1, *supra*; D60-3.

## D.    *Injunctive Relief*

### 1.    *Permanent Injunction*

The SEC requests a permanent injunction against Griffin to prevent him from future violations of securities laws. *See* D60 at 29–34. Regarding his violations of § 10(b) and Rule 10b-5, the SEC suggests this language:

> **IT IS HEREBY ORDERED** that [Griffin] is permanently restrained and enjoined from violating, directly or indirectly, [§] 10(b) of the … Exchange Act … [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:
>
> (a)    to employ any device, scheme, or artifice to defraud;
>
> (b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make

37

> the statements made, in the light of the circumstances under which they were made, not misleading; or
>
> (c)    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person
>
> by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any person, or (ii) disseminating false or misleading documents, materials, or information or making, either orally or in writing, any false or misleading statement in any communication with any investor or prospective investor, about:
>
> (A)    any investment strategy or investment in or offering of securities;
>
> (B)    the prospects for success of any product or company;
>
> (C)    the use of investor funds; or
>
> (D)    the misappropriation of investor funds or investment proceeds.
>
> **IT IS FURTHER ORDERED** that, as provided in [Rule 65(d)(2), Federal Rules of Civil Procedure], the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) [Griffin]'s officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with [Griffin] or with anyone described in (a).

D60-5 at 3–4. Regarding his violations of § 17(a), the SEC suggests this language:

> **IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that [Griffin] is permanently restrained and enjoined from violating, directly or indirectly, [§] 17(a) of the … Securities Act … [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails:
>
> (a)    to employ any device, scheme, or artifice to defraud;

(b)   to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser

by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any person, or (ii) disseminating false or misleading documents, materials, or information or making, either orally or in writing, any false or misleading statement in any communication with any investor or prospective investor, about:

(A)   any investment strategy or investment in or offering of securities;

(B)   the prospects for success of any product or company;

(C)   the use of investor funds; or

(D)   the misappropriation of investor funds or investment proceeds.

**IT IS FURTHER ORDERED** that, as provided in [Rule 65(d)(2), Federal Rules of Civil Procedure], the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) [Griffin]'s officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with [Griffin] or with anyone described in (a).

D60-5 at 4–5.

Section 21(d)(1) and (e) of the Exchange Act authorizes a district court to grant an injunction against any person engaged or about to engage in acts or practices constituting a violation of the Act:

(d)(1) Whenever it shall appear to the [SEC] that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter, [or] the rules or regulations

> thereunder, ... it may in its discretion bring an action in the proper district court of the United States ... to enjoin such acts or practices, and upon a proper showing a permanent ... injunction ... shall be granted without bond. ...
>
> ....
>
> (e) Upon application of the [SEC] the district courts ... shall have jurisdiction to issue ... injunctions ... commanding ... any person to comply with the provisions of this chapter, the rules, regulations, and orders thereunder[.]

15 U.S.C. § 78u(d)(1), (e). Section 20(b) of the Securities Act grants similar authorization:

> Whenever it shall appear to the [SEC] that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this subchapter, or of any rule or regulation prescribed under authority thereof, the [SEC] may, in its discretion, bring an action in any district court ... to enjoin such acts or practices, and upon a proper showing, a permanent ... injunction ... shall be granted without bond.

*Id*. § 77t(b).

To obtain a permanent injunction, a plaintiff must show that (1) it has succeeded on the merits, (2) irreparable harm will likely result in the absence of an injunction, (3) the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *See Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20, 32 (2008) (discussing the factors to obtain a preliminary injunction and finding that the factors also pertain to permanent injunctions); *accord Starbucks Corp. v. McKinney*, 602 U.S. 339, 345–46 (2024) ("When Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity. ... [T]he four criteria identified in *Winter* encompass the relevant equitable principles. ... This Court has consistently

40

employed this presumption when interpreting a wide variety of statutes that authorize … permanent injunctions."); *see also eBay Inc. v. MerchExchange, LLC*, 547 U.S. 388, 391 (2006) (explaining that, for a permanent injunction, "a plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction").

In the context of securities, the SEC must show "a prima facie case of previous violations of federal securities laws" and "a reasonable likelihood that the wrong will be repeated." *SEC v. Almagarby*, 92 F.4th 1306, 1321 (11th Cir. 2024) (quoted authority omitted). In assessing the likelihood of a repeat violation, courts consider "the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of the conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." *Id*. (alteration and quoted authority omitted).

"Every order granting an injunction ... must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail— and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). The Eleventh Circuit has "[r]epeatedly … said that, in the context of SEC enforcement actions and otherwise, 'obey-the-law' injunctions are unenforceable." *SEC v. Graham*, 823 F.3d 1357, 1362 n.2 (11th Cir. 2016). Still, "a broad, but properly drafted injunction, which largely uses the statutory or regulatory language may satisfy

the specificity requirement of Rule 65(d) so long as it clearly lets the defendant know what he is ordered to do or not do." *SEC v. Goble*, 682 F.3d 934, 952 (11th Cir. 2012); *see also SEC v. Keener*, 102 F.4th 1328, 1336–37 (11th Cir. 2024) (affirming the district court's grant of a permanent injunction enjoining the defendant from violating the Exchange Act where the injunction made "an important substitution to the statutory language" and "provided *more* detail than the Exchange Act").

Here, accepting the allegations as true, Griffin committed securities fraud. *See* § V.B.3, *supra*. His actions were recurrent and made with scienter. *See* § V.B.3(b), (d), *supra*. Investors remain out of their money. D57 ¶¶37, 54, 69. He evaded service of process. *See* D5, D7, D9, D13, D15. He has not appeared in this action despite personally receiving process, *see* D48, and provides no assurance against future violations or acknowledgment of his wrongful conduct. He is the subject of three separate criminal cases alleging fraud or theft.[9] *See* n.2, *supra*. Injunctive relief will aid the SEC in enforcing the securities laws and protecting the public while deterring him from committing future violations. Because his fraudulent investment scheme was unlawful, he will suffer no injury if prohibited from committing securities fraud in the future. And, of course, the public has a strong interest in prohibiting fraud in the offer or sale of securities and protecting potential investors from future harm.

While the SEC's proposed language largely uses the statutory language, *see* D60-5 at 3–5, the proposed language makes important additions to the statutory language and describes in greater detail the prohibited conduct,

---

[9]The criminal cases involve charges, not convictions. *See* n.2, *supra*. The recommendation is the same regardless of whether the charges are considered.

*compare* D60-5 at 3–4, *with* Rule 10b-5; *compare* D60-5 at 4–5, *with* § 17(a). Thus, the SEC's proposed language describes the acts restrained in reasonable detail and satisfies the specificity requirement. *See Goble*, 682 F.3d at 952; *Keener*, 102 F.4th at 1336–37.

### 2.    *Officer-and-Director Bar*

The SEC asks the court to permanently prohibit Griffin "from acting as an officer or director of any issuer that has a class of securities registered pursuant to [§] 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to [§] 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]." *See* D60-5 at 5 (quoted).

Section 21(d)(2) of the Exchange Act authorizes a district court to impose an officer-and-director bar upon any person who has violated § 10(b):

> In any proceeding under paragraph (1) of this subsection, the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine, any person who violated section 78j(b) of this title or the rules or regulations thereunder from acting as an officer or director of any issuer that has a class of securities registered pursuant to section 78*l* of this title or that is required to file reports pursuant to section 78*o*(d) of this title if the person's conduct demonstrates unfitness to serve as an officer or director of any such issuer.

15 U.S.C. § 78u(d)(2). Likewise, § 20(e) of the Securities Act authorizes a district court to impose an officer-and-director bar upon any person who has violated § 17(a):

> In any proceeding under subsection (b), the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine, any person who violated section 77q(a)(1) of this title from acting as an officer or director of any issuer that has a class of securities registered pursuant to section 78*l* of this

43

> title or that is required to file reports pursuant to section 78*o*(d) of this title if the person's conduct demonstrates unfitness to serve as an officer or director of any such issuer.

*Id.* § 77t(e).

"District courts are afforded substantial discretion in deciding whether to impose an injunction that bars an individual from serving as an officer or director." *SEC v. Hall*, 759 F. App'x 877, 884 (11th Cir. 2019) (citing *SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995)). When deciding whether to impose an officer-and-director bar and how long the bar should be, district courts may consider "(1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." *Id.* at 884–85 (quoting *Patel*, 61 F.3d at 141); *compare, e.g.*, *SEC v. Huff*, 758 F. Supp. 2d 1288, 1357 (S.D. Fla. 2010) (finding that "nothing less than a lifetime bar will protect investors from [the defendant]" because he had a record of securities fraud and offered no recognition of his wrongdoing), *with SEC v. Miller*, 744 F. Supp. 2d 1325, 1348 (N.D. Ga. 2010) (finding that a five-year bar sufficed because a bar is stigmatizing, the defendant had not served in any responsible position in a publicly-traded corporation for more than ten years, and any bar likely would be a lifetime bar considering the defendant's advanced age).

A permanent bar is a significant penalty. *See Patel*, 61 F.3d at 142 (describing a permanent bar as a "loss of livelihood" and noting "the stigma attached to permanent exclusion from the corporate suite"); *Huff*, 758 F. Supp. at 1357 (describing a permanent bar as "a very significant penalty" not considered lightly). Before imposing a permanent bar, some courts "consider

44

whether a conditional bar (e.g., a bar limited to a particular industry) and/or a bar limited in time (e.g., a bar of five years) might be sufficient, especially where there is no prior history of unfitness." *Patel*, 61 F.3d at 142.

Here, accepting the allegations as true, Griffin's violations were egregious and made with a high degree of scienter. *See* §§ III.A, V.B.3(d), *supra*. He held high-ranking positions of authority and control of the companies during the fraudulent scheme. *See* D57 ¶12. He profited from the violations by stealing investor funds and using them for personal use. *See id.* ¶¶6, 85–88. He continued the fraudulent scheme for almost two years. *See id.* ¶¶3–6. Some investors still remain out of money. *See id.* ¶¶37, 54, 69. Griffin has not appeared in this action despite personally receiving process, *see* D48, and provides no assurance against future violations or acknowledgment of his wrongful conduct. He is the subject of three separate criminal cases alleging fraud or theft. *See* n.2 & n.9, *supra*. The amount he raised (at least $5,895,024), and the number of investors he convinced to buy promissory notes (103), *see* D57 ¶¶3, 19, and his reliance on word-of-mouth, including from fellow church members, *see id.* ¶21, demonstrate his power of persuasion. A permanent, unconditional officer-and-director bar to protect potential investors from Griffin is warranted.

### E.   *The Proposed Order*

In the proposed order, the SEC asks the court to include these seven items: (1) a payment deadline, (2) payment directions, (3) warnings, (4) post-judgment interest, (5) language about fund distribution and retention of jurisdiction, (6) a penalty offset, and (7) bankruptcy-related language. *See* D60-5 at 6–9.

*1.*     *Payment Deadline*

The SEC asks the court to order Griffin to pay the SEC within 30 days of the entry of the final judgment. *See* D60-5 at 6.

Section 21(d)(3) of the Exchange Act and § 20(d) of the Securities Act provide procedures for penalties. *See* 15 U.S.C. §§ 77t(d)(3), 78u(d)(3)(C). "A penalty imposed … shall be payable into the Treasury of the United States, except as otherwise provided in [§ 308 of the Sarbanes-Oxley Act of 2002, codified at 15 U.S.C. § 7246.]" 15 U.S.C. §§ 77t(d)(3)(A), 78u(d)(3)(C)(i). Under § 308(a), "[i]f, in any judicial or administrative action brought by the [SEC] under the securities laws, the [SEC] obtains a civil penalty against any person for a violation of such laws … the amount of such civil penalty shall, on the motion or at the direction of the [SEC], be added to and become part of a disgorgement fund or other fund established for the benefit of the victims of such violation." 15 U.S.C. § 7246(a). Sections 21(d)(3) and 20(d) further provide, "If a person upon whom such a penalty is imposed shall fail to pay such penalty within the time prescribed in the court's order, the [SEC] may refer the matter to the Attorney General who shall recover such penalty by action in the appropriate United States district court." *Id.* §§ 77t(d)(3)(B), 78u(d)(3)(C)(ii).

Courts have ordered defendants to pay disgorgement, prejudgment interest, and civil penalties to the SEC by a deadline. *See, e.g., SEC v. Hayter*, 96 F. Supp. 3d 1299, 1305–06 (M.D. Fla. 2015) (ordering payment within 30 days of entry of final judgment); *SEC v. Irizarry*, No. 8:19-mc-77-T-30AEP, 2019 WL 3214247, at *1–2 (M.D. Fla. July 17, 2019) (ordering payment within 14 days of entry of final judgment); *SEC v. Hoppes*, No. 8:13-cv-868-T-23AEP, 2014 WL 12621238, at *3 (M.D. Fla. Apr. 17, 2014) (ordering payment within

46

14 days of entry of final judgment); *SEC v. BIH Corp.*, No. 2:10-cv-577-FtM-29DNF, 2012 WL 4458356, at *3 (M.D. Fla. Sept. 26, 2012) (ordering payment within 30 days of entry of final judgment).

Considering the language of sections 21(d)(3) and 20(d), and to foster prompt payment, mandating the 30-day payment deadline is warranted.

### 2.    *Payment Directions*

The SEC asks the court to include in the order directions on how Griffin should pay the SEC. *See* D60-5 at 6.

Courts have included payment directions in final judgments. *See, e.g.*, *Hayter*, 96 F. Supp. 3d at 1306; *Irizarry*, 2019 WL 3214247, at *1; *Hoppes*, 2014 WL 12621238, at *3; *BIH Corp.*, 2012 WL 4458356, at *3.

To foster timely payment, including the requested payment instructions is warranted.

### 3.    *Warnings*

The SEC asks the court to warn Griffin that, "[b]y making this payment, [Griffin] relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to [Griffin]." *See* D60-5 at 7 (quoted). The SEC wants the court to further warn Griffin that the SEC may enforce the court's judgment for disgorgement and prejudgment interest by using all collection procedures authorized by law, including the Federal Debt Collection Procedures Act, codified at 28 U.S.C. §§ 3001–3308, and moving for civil contempt. *See* D60-5 at 7.

47

The Federal Debt Collection Procedure Act "provides the exclusive civil procedures for the United States … to recover a judgment on a debt[.]" *See* 28 U.S.C. § 3001(a)(1) (quoted). Rule 70, Federal Rules of Civil Procedure, provides that a court may hold a party that fails to perform a specific act required by judgment in contempt.

The SEC provides no basis for including the language in the order, and the basis is not apparent. *See* D60, D60-5. Ordering Griffin to pay disgorgement, prejudgment interest, and a civil penalty suffices.

### 4.  *Post-Judgment Interest*

The SEC asks the court to order Griffin to pay post-judgment interest on any amount due. *See* D60-5 at 7.

Post-judgment interest under 28 U.S.C. § 1961(a) is automatic, *Gele v. Wilson*, 616 F.2d 146, 148 (5th Cir. 1980); mandatory, *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 12 F.3d 1045, 1053 (11th Cir. 1994); not waived by failing to request it, *id.*; and "accrues from the date of a judgment whether or not the judgment expressly includes it," *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1339 n.37 (11th Cir. 1999) (quoted authority omitted).

To make clear that post-judgment interest is accruing, ordering Griffin to pay post-judgment interest is warranted.

### 5.  *Language About Fund Distribution and Retention of Jurisdiction*

The SEC asks the court to include this language about a plan to distribute the fund and asks the court to retain jurisdiction for distribution:

> The [SEC] may propose a plan to distribute the Fund subject to the Court's approval. Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of [§] 308(a) of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7246(a)]. The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court.

*See* D60-5 at 7 (quoted); *see also* D60-5 at 9 (proposed order stating that the court "shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment"). In the operative pleading, the SEC asks the court to retain jurisdiction over this action "to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the SEC for additional relief within the jurisdiction of this Court." D57 at 24.

Section 308(a) of the Sarbanes-Oxley Act provides that when the SEC obtains a civil penalty against a person in violation of securities law, the SEC may move for that civil penalty to become a part of a disgorgement fund. *See* 15 U.S.C. § 7246(a). In securities fraud actions, courts have retained jurisdiction to enforce the final judgment. *See, e.g.*, *Hayter*, 96 F. Supp. 3d at 1307; *Irizarry*, 2019 WL 3214247, at *2; *Hoppes*, 2014 WL 12621238, at *4; *BIH Corp.*, 2012 WL 4458356, at *4.

Considering the potential distribution of funds and the need for fair distribution, including the language about fund distribution and retaining jurisdiction is warranted.

49

*6.    Penalty Offset*

The SEC asks the court to include in its order this language regarding a penalty offset:

> Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Final Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, [Griffin] shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on [Griffin]'s payment of disgorgement in this action, argue that he is entitled to, nor shall he further benefit by, offset or reduction of such compensatory damages award by the amount of any part of [Griffin]'s payment of a civil penalty in this action ("Penalty Offset"). If the Court in any Related Investor Action grants such a Penalty Offset, [Griffin] shall, within 30 days after entry of a final order granting the Penalty Offset, notify the [SEC]'s counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the [SEC] directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Final Judgment. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against [Griffin] by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

D60-5 at 7–8.

Section 162 of the Internal Revenue Code provides certain tax deductions, but states that "no deduction otherwise allowable shall be allowed … for any amount paid or incurred (whether by suit, agreement, or otherwise) to, or at the direction of, a government or governmental entity in relation to the violation of any law[.]" 26 U.S.C. § 162(f)(1).

The SEC says nothing about this language in the operative pleading, *see* D57, the SEC provides no basis for including the language in the order, and

50

the basis is not apparent. *See* D60, D60-5. Under these circumstances, excluding the language is warranted.

7.    *Bankruptcy-Related Language*

The SEC asks the court to include in its order this language regarding bankruptcy:

> **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that, solely for purposes of exceptions to discharge set forth in [§] 523 of the Bankruptcy Code, 11 U.S.C. § 523, the allegations in the Second Amended Complaint[, D57] are true and admitted by [Griffin], and further, any debt for a civil penalty or other amounts due by [Griffin] under this Final Judgment or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by [Griffin] of the federal securities laws or any regulation or order issued under such laws, as set forth in [§] 523(a)(19) of the Bankruptcy Code, 11 U.S.C. § 523(a)(19).

D60-5 at 8–9.

Under § 523(a)(19) of the Bankruptcy Code, "A discharge … does not discharge an individual debtor from any debt … that … is for … the violation of any of the Federal securities laws … or order issued under such Federal … securities laws[.]" 11 U.S.C. § 523(a)(19)(A)(i).

The SEC provides no basis for including the language in the order, and the basis is not apparent. *See* D60, D60-5. Excluding the language is warranted.

### F.      Jury Demand

The Seventh Amendment "entitles a defendant to a jury trial when the SEC seeks civil penalties against him for securities fraud." *SEC v. Jarkesy*, 603 U.S. 109, 120–21 (2024).

A "proper" demand for a jury trial "may be withdrawn only if the parties consent." Fed. R. Civ. P. 38(d); *see also* Fed. R. Civ. P. 38(a) ("The right of trial by jury as declared by the Seventh Amendment to the Constitution—or as provided by a federal statute—is preserved to the parties inviolate."); Fed. R. Civ. P. 39(a) ("When a jury trial has been demanded under Rule 38, the action must be designated on the docket as a jury action. The trial on all issues so demanded must be by jury unless: (1) the parties or their attorneys file a stipulation to a nonjury trial or so stipulate on the record; or (2) the court, on motion or on its own, finds that on some or all of those issues there is no federal right to a jury trial.").

The default-judgment rule requires, for damages, the preservation of "any federal statutory right to a jury trial." *See* Fed. R. Civ. P. 55(b)(2). The advisory committee notes to a previous version of the provision make clear that preserving a right to a jury trial is required in the default judgment context only when the pertinent statute expressly provides that the right to a jury trial survives default. The previous version provided,

> If, in order to enable the court to enter judgment …, it is necessary to take an account or to determine the amount of damages …, the court may conduct such hearings or order such references as it deems necessary and proper and shall accord a right of trial by jury to the parties when and as required by any statute of the United States.

Fed. R. Civ. P. 55(b)(2) (1938). The advisory committee notes to that version reference 28 U.S.C. § 785, a statute on which 28 U.S.C. § 1874 is based. Section 1874 expressly provides that the right to a jury trial survives default:

> In all actions to recover the forfeiture annexed to any articles of agreement, covenant, bond, or other specialty, wherein the forfeiture, breach, or nonperformance appears by **default** … of the defendant, the court shall render judgment for the plaintiff for such amount as is due. If the sum is uncertain, it **shall, upon request of either party, be assessed by a jury**.

28 U.S.C. § 1874 (emphasis added).[10]

The SEC demanded a jury trial in the operative pleading, D57 at 24, but does not demand one in the motion for default judgment, *see* D60. In the SEC's previous motion for default judgment based on the original complaint, D1, the SEC explicitly states that it "no longer maintains a jury demand for a determination of financial relief." *See* D31 at 1 (quoted). Although the SEC fails to make the same clear withdrawal here, the court presumes the SEC

---

[10]A former Fifth Circuit case holding a jury must determine an issue of fact on damages unless the parties, including a defaulting party, waive a jury determination in writing, *Thorpe v. National City Bank of Tampa*, 274 F. 200, 202 (5th Cir. 1921), is not binding because it precedes the Federal Rules of Civil Procedure. *See In re Dierschke*, 975 F.2d 181, 185 (5th Cir. 1992) ("It is also 'clear ... that in a default case neither the plaintiff nor the defendant has a constitutional right to a jury trial on the issue of damages.'") (quoting 5 Moore's Federal Practice § 38.19[3] (1992)). A former Fifth Circuit case post-dating the rules expresses the same principle but only in non-binding dictum. *See Bass v. Hoagland*, 172 F.2d 205, 206–11 (5th Cir. 1949) (holding that a district court improperly entered default judgment under circumstances amounting to a due-process deprivation, including by awarding damages without a jury "as required by Rules 38 and 55(b)(2)"). Other contrary authority is not persuasive because it fails to analyze or persuasively analyze the "any federal statutory right to a jury trial" phrase in Rule 55(b)(2). *See, e.g., Zero Down Supply Chain Sols., Inc. v. Glob. Transp. Sols., Inc.*, 282 F.R.D. 604, 605–07 (D. Utah 2012); *Mitchell v. Bd. of Cnty. Comm'rs of Santa Fe*, No. CIV 05-1155 JBALM, 2007 WL 2219420, at *13 (D.N.M. May 9, 2007).

withdraws its jury demand based on the SEC's request for the court to enter final judgment against Griffin and award the SEC with specific monetary amounts. *See* D60 at 39.

### G.    *Servicemembers Civil Relief Act*

Because Griffin is an individual, the undersigned addresses the Servicemembers Civil Relief Act, 50 U.S.C. §§ 3931–3938a.

Under the Act, for any civil action "in which the defendant does not make an appearance," the court, "before entering judgment for the plaintiff," must "require the plaintiff to file with the court an affidavit—(A) stating whether or not the defendant is in military service and showing necessary facts to support the affidavit; or (B) if the plaintiff is unable to determine whether or not the defendant is in military service, stating that the plaintiff is unable to determine whether or not the defendant is in military service." 50 U.S.C. § 3931(a), (b)(1).

Here, the SEC provides an affidavit signed by Ordaz regarding Griffin's military service. D60-1. She states that on May 11, 2026, she researched whether Griffin serves in the military by searching his name and date of birth in the Servicemembers Civil Relief Act public website database. D60-1 ¶¶2–3. She states that the military status report obtained from the website and attached to the affidavit shows that Griffin is not on active military duty. *Id.* ¶4, p. 4. Through the affidavit, the SEC has complied with the law.

### H.    *Competency*

Under Rule 55(b)(2), Federal Rules of Civil Procedure, a court may enter default judgment against an incompetent person only if the person is

represented by a "general guardian, conservator, or other like fiduciary who has appeared." Rule 17(c)(2), Federal Rules of Civil Procedure, requires a court to appoint a guardian ad litem or "issue another appropriate order" to protect an incompetent person who is unrepresented in an action. A court may abuse its discretion if it fails to consider Rule 17(c)(2) when presented with evidence from a court or public agency indicating that a party had been adjudicated incompetent or with verifiable evidence from a mental health professional demonstrating that the party is being or has been treated for mental illness of the type that would render them legally incompetent. *Powell v. Symons*, 680 F.3d 301, 307 (3d Cir. 2012); *Ferrelli v. River Manor Health Care Ctr.*, 323 F.3d 196, 201 (2d Cir. 2003).

Considering the pending competency proceedings in one of the state criminal cases against Griffin, *see Griffin*, No. 16-2024-CF-003129-AXX-MA (D83, D90); § II & n.2, *supra*, the undersigned has, by separate order, directed the SEC, by August 21, 2026, to state its position, with supporting legal authority, on whether this civil case, including the period for objecting to the report and recommendation on default judgment, should be stayed until the state court rules on competency.

## VI.   Recommendation

The undersigned recommends entering an order with this language.

> The court **grants** in part and **denies** in part the application for default judgment, D60.
>
> The court **awards** the SEC these amounts: $694,529 in disgorgement, $150,304.86 in prejudgment interest, and $694,529 as a civil penalty. Within 30 days of entry of final judgment in this action, Griffin must pay the amounts to the

SEC. Post-judgment interest begins to accrue after the entry of the final judgment.

Griffin may transmit payment electronically to the SEC, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Griffin may also pay by certified check, bank cashier's check, or United States postal money order payable to the SEC and delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

The payment must be accompanied by a letter identifying the case title, civil action number, and name of this court; identifying Griffin as the defendant; and specifying that payment is made pursuant to the final judgment.

Griffin must simultaneously transmit photocopies of evidence of payment and case-identifying information to the SEC's counsel in this action.

The court **enters** a permanent injunction restraining and enjoining Griffin, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with him:

from violating, directly or indirectly, § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a)   to employ any device, scheme, or artifice to defraud;

56

(b)   to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)   to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person

by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any person, or (ii) disseminating false or misleading documents, materials, or information or making, either orally or in writing, any false or misleading statement in any communication with any investor or prospective investor, about:

(a)   any investment strategy or investment in or offering of securities,

(b)   the prospects for success of any product or company,

(c)   the use of investor funds, or

(d)   the misappropriation of investor funds or investment proceeds.

The court further **enters** a permanent injunction restraining and enjoining Griffin, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with him:

from violating, directly or indirectly, § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails:

(a)   to employ any device, scheme, or artifice to defraud;

57

(b)   to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser

by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any person, or (ii) disseminating false or misleading documents, materials, or information or making, either orally or in writing, any false or misleading statement in any communication with any investor or prospective investor, about:

(a)   any investment strategy or investment in or offering of securities;

(b)   the prospects for success of any product or company;

(c)   the use of investor funds; or

(d)   the misappropriation of investor funds or investment proceeds;

The court further **enters** a permanent officer-and-director bar under § 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), and § 20(e) of the Securities Act, 15 U.S.C. § 77t(e), prohibiting Griffin from acting as an officer or director of any issuer that has a class of securities registered pursuant to § 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to § 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

The SEC may propose a plan to distribute a fund subject to the court's approval. Such a plan may provide that the fund shall be distributed pursuant to the Fair Fund provisions of § 308(a)

of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7246(a). The fund may only be disbursed pursuant to an order of the court.

The court **retains** jurisdiction over the action to enforce the terms of the final judgment, entertain any suitable application or motion by the SEC for additional relief within the jurisdiction of the court, and administer the distribution of any funds.

## VII.  Objections

"Within 14 days after being served with a copy of [a] recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). An objection must not exceed 10 pages. Local Rule 3.01(b). "A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). A response must not exceed 10 pages. Local Rule 3.01(c). "The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); *see also* 28 U.S.C. § 636(b)(1)(C) ("A [district judge] shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."). "A party failing to object … waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1.

**Entered** in Jacksonville, Florida, on August 7, 2026.

Patricia D. Barksdale
United States Magistrate Judge

c:      The Honorable Brian J. Davis

        Counsel of record

        Cedric Dewayne Griffin
        Montgomery Correctional Center
        4727 Lannie Rd.
        Jacksonville, FL 32218